218 U.S. 88 (1910)
INTERSTATE COMMERCE COMMISSION
v.
CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.
BURNHAM, HANNA, MUNGER DRY GOODS COMPANY
v.
SAME.
Nos. 663, 664.
Supreme Court of United States.
Argued April 5, 6, 1910.
Decided May 31, 1910.
APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.
*89 Mr. Wade H. Ellis and Mr. Luther M. Walter, Special Assistants to the Attorney General, with whom Mr. Edwin P. Grosvenor, Special Assistant to the Attorney General, for the Interstate Commerce Commission, appellants in No. 663.
Mr. John H. Atwood and Mr. John Lee Webster, with whom Mr. George T. Bell was on the brief, for appellants in No. 664.
Mr. William D. McHugh and Mr. Colin C.H. Fyffe for appellees.
Mr. Frederick Manley Ives and Mr. Everett M. Burdett filed a brief as amici curiae on behalf of the Boston Chamber of Commerce and certain other business organizations.
MR. JUSTICE McKENNA delivered the opinion of the court.
The question in the case is the validity of an order of the Interstate Commerce Commission reducing the class rates charged by the appellee railroad companies on through freight shipped from the Atlantic seaboard to *90 Kansas City, and St. Joseph, Missouri, and Omaha, Nebraska, cities on the Missouri River and called throughout the record, and in this opinion, Missouri River cities.
The through class rates were reduced from 1/147 2/120 3/93 4/68 5/57 in cents per 100 pounds to 1/138 2/113 3/88 4/64 5/54. The numbers above the lines indicate the classes and the numbers below the lines the rates.
The reduction was made in that part of the through rate which applied to the haul between the Mississippi and Missouri Rivers. Explaining its order of reduction, the Commission said the through rates from Atlantic seaboard terminals to the Missouri River cities are made by adding together the rates from points of origin to the Mississippi River crossings, using proportional rates when such were available, and the local rates from the Mississippi crossings to the Missouri River cities. The through rates the Commission pronounced to be unreasonably high, "because those portions of the through rates which apply between the Mississippi River crossings and the Missouri River cities are too high. These are defendants' `separately established rates,' which are `applied to the through transportation,' and, therefore, the through rates should be adjusted by reduction of those factors or parts thereof which are found to be unreasonable."
The division of the rates as established by the railroad was as follows: From New York to the several Mississippi River crossings on traffic moving through them to points beyond, in cents per 100 pounds, 1/87 2/75 3/58 4/41 5/35. From the Mississippi River crossings to the Missouri River cities, 1/60 2/45 3/35 4/27 5/22. The latter are local class rates under the Western classification, and are those which the Commission adjudged too high, and which it reduced in cents per 100 pounds, to the following: 1/37 2/38 3/30 4/23 5/19. The amount of reduction, it will be observed, is nine cents on first-class freight and a proportional reduction on the other four classes.
The order of the Commission required the railroad *91 companies to cease and desist on or before the twenty-fifth of August, 1908, from charging, demanding or collecting anything in excess of the rates last above set out, and the companies were required to put such rates in force before the twenty-fifth of August, 1908, and maintain them for a period of not less than two years.
The proceedings before the Commission were begun by a petition filed by appellants in case No. 664, who were doing business in Kansas City and St. Joseph, Missouri, and Omaha, Nebraska. They alleged that they were engaged in either the mercantile or manufacturing business, and in buying and selling various commodities shipped from the Atlantic seaboard to them, respectively, under the definite freight classifications maintained by the railroad companies. The rates, according to the classifications, from New York to St. Paul and Minneapolis and rates from New York to Chicago, and from the latter city to Kansas City, St. Joseph and Omaha, the petition alleged, "are arrived at by adding to the rates from Mississippi River points, as shown above, the following rates subject to official classification, to wit: 87c, 75c, 58c, 41c and 35c per hundred pounds for said five classes, respectively; that the aforesaid through rates, applying from New York to Kansas City, are observed by defendant carriers on traffic moving by way of Chicago; that in the division of said through rates from Atlantic seaboard to said three Missouri River cities, Kansas City, St. Joseph and Omaha, each of said defendant railroad companies allows and pays to said Eastern connections 72.3c, 62.4c, 48.4c, 34.3c and 29.4c per hundred pounds on the said five classes, respectively; and charges, accepts and retains as their respective shares of said through rates upon the several classes aforesaid 74.7c, 57.6c, 44.6c, 33.7c and 27.6c per hundred pounds."
A table showing the distance of the various roads from New York to St. Paul and Minneapolis, and the Missouri *92 River cities is given, which shows that the distances are not materially different, and also shows distances west of Chicago.
It is alleged that the rates charged and the classifications enforced by the company for the transportation of property from the Atlantic seaboard and other producing territory to the Missouri River cities "are in themselves unreasonable and relatively unjust, unfair and prejudicial as compared with rates from the same territory to St. Paul and Minneapolis," though the volume or tariff and the cost of handling it is not greater. Discrimination is alleged, with a detail of circumstances, against the Missouri River cities and the violation of the Interstate Commerce Act.
What are conceived to be reasonable rates are set out, and that the rates charged are alleged to be discriminatory against the complainants, and are excessive and unreasonable in and of themselves, because higher and greater than enough to pay the cost of transportation and maintenance and a fair profit on the valuation of the property employed.
The railroad companies filed separate answers, in which they admitted the charges and rates set out in the petition and the division thereof, but denied discrimination in favor of St. Paul and Minneapolis against the Missouri River cities and alleged competitive conditions, existing as to the first-named cities. They denied that the rates from the Atlantic seaboard to the last-named cities suggested by the petitioners would be reasonable or just, or that the rates charged are unduly high or excessive or discriminate against the Missouri River cities or the petitioners.
The Chicago and Northwestern Railway Company filed an amended answer, in which it alleged that the complaint related to the through rates from the Atlantic seaboard to the Missouri River cities, and that they were alleged to *93 be unfair and prejudicial compared to rates to St. Paul and Minneapolis, and "unreasonable and excessive in and of themselves." And, further, that the rates had been fixed and established by the railroad companies by virtue of joint traffic agreements, and had been duly filed, posted and published by the companies, and that all the companies to such agreements were necessary parties. Fifty or more companies were named.
The Eastern companies, (those operating east of Chicago), answering, denied that there was any agreement between them and the original respondents for the shipment and division of through rates between the Atlantic seaboard and St. Paul and Minneapolis, and alleged that in conjunction with their several connections they receive to Chicago the same rate in cents per hundred pounds as applied upon like tariff originating at the same points of origin and terminating at Chicago, and are not concerned with the rates or proportional rates charged or accepted by the different carriers from Chicago to St. Paul or Minneapolis. They also denied that they were parties to any joint tariff of class rates from the Atlantic seaboard to the Missouri River cities. They admitted participation in joint through class rates to Mississippi River points and denied that they, however, were unreasonable or unjust in or of themselves or as respectively applied to shipments destined to St. Paul or Minneapolis or shipments destined to points west of the Mississippi River.
They further alleged as follows:
"That the rates from New York city to East St. Louis, Illinois, are computed at 116 per cent of the rates from New York to Chicago according to relative distances, that the rates from New York to East St. Louis are part of a general structure of rates whereby all rates from New York and other Eastern points to points in the States of Ohio, Indiana, Illinois, Michigan, Pennsylvania, Kentucky and Wisconsin, and the Province of Ontario are made *94 upon the bases of percentages of the rates from the points of origin to Chicago; that the said rates for the first five classes governed by the official classification from New York to East St. Louis of 87c, 75c, 58c, 41c and 35c per hundred pounds, respectively, are applied as proportional rates to the various Mississippi River crossings north of East St. Louis, to and including East Dubuque, Illinois, and that from other Eastern points than New York city the rates to East St. Louis apply equally to said Mississippi River crossings, and all of such rates to said Mississippi River crossings apply uniformly upon all shipments destined to all points west of the Mississippi River and east of Pacific coast terminals and points taking the same rates. Respondents allege that all of the rates from Eastern points to said Mississippi River crossings are just and reasonable in and of themselves and as applied to shipments destined to any point west of the Mississippi River and east of Pacific coast terminals."
They alleged that the rates to the Mississippi River crossings are governed by the Official classification, and those from the latter crossings to the Missouri River points are governed by the Western classification, and that innumerable articles are differently classified in such classifications. That it would be impossible to establish joint through rates on the basis set out in the petition without simultaneously applying the official classification to all traffic from all Eastern points and all points intermediate between the rivers and establishing relative through class rates from all such Eastern points to all such intermediate points between the rivers, and that this would require a general revision and reduction of rates, which would cause great hardship and irreparable injury to the respondents and other interstate carriers not parties to the proceeding.
It is alleged that the reasonableness of the rates from Eastern points to Chicago and to the Mississippi River is *95 not questioned by petitioners, and that the grievance of the latter, if they have any, lies in the rates applied by the original respondents from Chicago and the Mississippi River crossings to the Missouri River cities on shipments originating at Eastern points. They hence prayed to be dismissed. They were subsequently dismissed.
The Sioux City Commercial Club intervened and supported the petition, and prayed that whatever should be done for the other Missouri River cities should be done for Sioux City. The St. Paul Jobbers and Manufacturers Association and the Minneapolis Commercial Club intervened and in substance coincided with the views and interest of the defendant carriers.
A great deal of testimony was taken and the order made which has been recited. The appellee companies then filed a bill in the Circuit Court of the United States for the Northern District of Illinois, Eastern Division, for a temporary and permanent injunction against the order, that it be annulled, and the Interstate Commerce Commission be enjoined from enforcing it. A temporary injunction was granted. It was made permanent on final hearing, the court dividing. 171 Fed. Rep. 680.
The pleadings in the case are very voluminous. They consist of the bill of the railroad companies, the answers to it by the Interstate Commerce Commission and the intervening petitions of certain other railroad companies, and mercantile and manufacturing concerns.
Even a summary of the pleadings would be very long and we shall, therefore, say but little more than that the allegations of the bill and those of the answer of the Commission and its denials are such as tend to the support of the respective contentions of the companies and the Commission, upon which we shall hereafter comment. We may, however, say further that emphasis is given to certain matters. The companies make prominent that two classifications of freight are in force upon which tariff rates *96 are based, the Official classification from the Atlantic seaboard to the Mississippi River and the Western classification, between the river and the Missouri River cities; that the classifications materially differ and constrain different rates; that those between the rivers are just and reasonable and apply to all merchandise, whatever be its point of origin. That business conditions have grown up and are dependent upon the rates established, which will be disturbed by their alteration; that their alteration as required by the order of the Commission will compel a discrimination between shippers and localities, to do which is in excess of the powers of the Commission.
It is alleged that the rates are fair compared to the cost of service, absolutely and relatively, and that the rates east of the Mississippi River are not changed, the order affecting alone the proportion of the through rates charged by the complainant carriers, and will compel new through rates, which will not affect the proportion thereof received by the Eastern carriers.
And it is alleged that the Commission only has power to establish, after hearing on complaint, through rates and joint rates and prescribe the just and reasonable proportions of such rates between the carriers only when they (the carriers) fail to agree upon the proportion or division thereof, and that there was no evidence that they had failed to agree upon such rates or the proportion and divisions thereof, and that, therefore, the order exceeds the power of the Commission and deprives the companies of their property without due process of law, in violation of the Fifth Amendment of the Constitution of the United States.
It is further alleged that there was no evidence that the rates between the rivers are unjust or unreasonable, except by comparison with other rates; that no evidence was offered of cost of service or of the various elements proper to be considered in determining whether a rate is just and *97 reasonable in and of itself, and that "the whole and only reason and the whole and only conclusion" of the Commission upon which the reduction was ordered was because the Commission decided that merchandise shipped from the Atlantic seaboard should be transported by the companies at a lower charge than that exacted for the transportation of an equal amount of merchandise when the same was shipped from St. Louis, Chicago or other points west of the Atlantic seaboard. And this, it alleged, is in excess of the powers of the Commission, misapplies the law, and compels the companies to serve a certain class of shippers at an unreasonable rate, and to take a rate lower than is charged other shippers for a like service, which involves less expense to the companies.
A loss of revenue is alleged, which will result in a deprivation of their property without due process of law, and that the enforcement of the order, even if it be finally set aside, will cause great disturbance to the business of the companies.
The Commission meets those points with denials of the facts alleged and their consequences, and opposes them as well by other facts and considerations.
It asserts that the bill has no equity because all the matters and things set forth therein are cognizable before it (the Commission), and it has the power to suspend, modify or amend its order as upon a proper showing might be proper; that it has information for such action, for under the law the operation and operating results of each railroad is required to be filed with it, "and the subject is under constant investigation." And in such investigation, it was alleged, many elements must enter, and that the fixed charges of maintenance and operation and the cost of operation and handling of different classes of freight, state and interstate, hauled on the same train, widely different in character and value, cannot mathematically be determined so as to apportion to each class *98 of traffic its proper division of costs, and that no method of apportionment can be devised except that which involves the exercise of judgment, and the results vary according to the method used. The Commission, therefore, says that the statements and allegations of the bill are mere conclusions and opinions which necessarily involve consideration of all these complex and difficult problems and should not be accepted for the purpose of setting aside its order.
Supplementing this the Commission sets forth that on the hearing before it oral and documentary evidence was taken, to which it gave full consideration, and to the reports filed by the companies with it in accordance with the statute, and that its order was made in accordance with the statute, and that so far from exceeding its powers it might have made a greater reduction, but it left the companies on the Atlantic seaboard business destined to Missouri points to charge one hundred per cent more than the same railroads voluntarily charge on transcontinental business, and, it is alleged, that it appeared from the testimony of one witness that the latter business yielded some profit, and by another witness testified, as an expert, that a rate fifty per cent higher would be "too large, of course."
The Commission alleges the reasonableness of the rates ordered by it, and that they are less than the companies charge and accept for transcontinental freight originating at the Atlantic seaboard and destined to Pacific coast terminals, the expense of service being no greater. A comparison is made also with Montana points and Spokane points, showing the rates to be less than to the Missouri River cities carried on the same railroads. So also to Oklahoma common points. So also for traffic originating at Pittsburg and carried through Chicago to Missouri River points, and at Chicago destined to Texas common points.
*99 The reason given by the Commission for not disturbing the rates of the Eastern roads is that neither the complainant before it nor the companies charged that these rates were excessive, nor was a reduction of them sought, but, on the contrary, it was conceded that such rates were just and reasonable. The Eastern carriers were, therefore, dismissed from the proceedings.
The other allegations but give further details and illustrations of the foregoing.
An order was made allowing the Illinois Central Railway Company, the Atchison, Topeka and Santa Fe Railway Company, the Chicago and Alton Railroad Company, the Missouri Pacific Railway Company, the Missouri, Kansas and Texas Railway Company, and the St. Louis and San Francisco Railroad Company to file petitions of intervention. The allegation of these petitions are substantially the same as those of the bill. The answer filed by the Interstate Commerce Commission to the bill was taken as filed to the intervening petition.
Leave to intervene was also given to certain business houses of Milwaukee, St. Louis, Chicago, Detroit and Cleveland. Their petition set forth with some detail the discrimination, as it was alleged, that would be worked against them in favor of merchants at the Atlantic seaboard and Missouri River cities by the order of the Commission, and also the disturbance of the commercial conditions which would result from the order. The Burnham, Hanna, Munger Dry Goods Company, one of the complainants before the Commission, and a number of other corporations and copartnerships, were allowed to file petitions in intervention. The petitions defended the order of the Commission, and again asserted that the rates between the Mississippi and the Missouri Rivers were unreasonable.
Evidence was taken and the court made the temporary injunction permanent.
*100 The court carried into and made the foundation of its opinion the conception it had formed and expressed upon granting the preliminary injunction, that is, that the purpose of the Commission was not so much the reduction of unreasonable rates as protection of the Missouri River cities against competition. The court said: "Indeed, the contest in its larger aspect is a contest not so much between the shippers and the railroads as between the commercial and manufacturing interests of the Missouri River cities and of the Atlantic seaboard on the one part (their interests being identical) and the commercial and manufacturing interests of what is known as the Central Traffic territory (the territory west of Buffalo, Pittsburg and Parkersburg, and east of the Mississippi River) on the other part."
To support this view it was said that the differential of 9 cents on merchandise from the Atlantic seaboard to the Missouri River cities, whatever be the principle upon which the order was based, will be "to protect to a certain degree the Denver jobbers and manufacturers within a given zone of territory against the jobbers and manufacturers in the Central Traffic Association territory . . . as also to open up to the Atlantic seaboard," in its trade with the Missouri River, "zones of territory, the advantages contained in the differentials against the competition of both the intervening Central Traffic Association territory and the Missouri River territory." And this, it was asserted, was the exercise of a "power artificially to apportion out the country into zones tributary to given trade centers, to be predetermined by the Commission, and non-tributary to others." This, it was further said, was a "power essentially different in principle from the mere power of naming rates that are reasonable."
We make these quotations from the opinion of the court because they put, in a clear and condensed way, the ultimate contention of the companies and the evil, as they see *101 it, in the order of the Commission, and which is intended to be exhibited by their voluminous pleadings and arguments. And such, it is insisted, was the conscious purpose of the Commission, a view in which the Circuit Court concurred, deducing it from certain avowals of the Commission in its report.
Such purpose and the want of power in the Commission to execute it is the foundation of the court's opinion. No analysis of the facts were made which concerned any other proposition or issue. The question involved, the court said, was not one of fact, but one of power; it is not whether, by the application of correct principles, a given rate had been decided to be unreasonable, but whether the principles applied are those within the power of the Commission. If this be so, we may wonder at the voluminous pleadings and the equally voluminous evidence. The elements of it were on the face of the report of the Commission. The court certainly thought it could be discerned on the face of the pleadings when passing on the motion for preliminary injunction. This question then we must regard as paramount and to it we will address ourselves. It may be that no other question is necessary to be decided. What the court would have done, with all other questions, we are not able to say. It took occasion to remark:
"It must be understood, however, that these orders of the Commission are enjoined solely because, in our judgment, they lay upon the commerce and manufacturing of the localities affected an artificial hand that Congress never intended should be put forth, and therefore are outside the power conferred on the Commission by Congress; for with the question of a reduction in rates, or a readjustment of rates, from which such artificial results have been eliminated, we are not now dealing."
A member of the court dissented from its judgment, and declared the grievance that the companies asserted *102 against the order of the Commission was not sustained by the evidence.
Is it true that the Interstate Commerce Commission by its order exercised a power "artificially to apportion out the country into zones tributary to given trade centers," and intentionally exercised it to protect the Missouri River cities against the competition of other cities? If that be the necessary conclusion the judgment of the Circuit Court it may be contended was right. Such conclusion we should certainly be reluctant to adopt. From whatever standpoint the powers of the Interstate Commerce Commission may be viewed, they touch many interests, they may have great consequences. They are expected to be exercised in the coldest neutrality. The Commission was instituted to prevent discrimination between persons and places. It would indeed be an abuse of its powers to exercise them so as to cause either. And the training that is required, the comprehensive knowledge which is possessed, guards or tends to guard against the accidental abuse of its powers, or, if such abuse occur, to correct it. The possession of such advantages is one of its defenses. It alleges that by § 12 of the Interstate Commerce Act it is given authority to inquire into the management of the business of all common carriers subject to the provisions of the act, and is required to keep itself informed as to the manner and method in which the same is conducted, and is "authorized and required to execute and enforce the provisions of the act." Other sections are more specific in grants of power. Rates may not only be investigated and be pronounced unjust or unreasonable or discriminatory but other rates may be prescribed. These, we repeat, are great powers and means of their proper exercise are conferred. Investigation may be conducted, and as the Commission says in its answer, "that to enable it to perform its duties such information as shows the operations and operating results *103 of each railway is" required to be filed with it and the subject is under constant investigation.
The outlook of the Commission and its powers must be greater than the interest of the railroads or of that which may affect those interests. It must be as comprehensive as the interest of the whole country. If the problems which are presented to it therefore are complex and difficult, the means of solving them are as great and adequate as can be provided. And arguments which point out and assail the imperfection which may appear in the result, this court has taken occasion to characterize. "They assail," it was said, "the wisdom of Congress in conferring upon the Commission the power which has been lodged in that body to consider complaints as to violations of the statute and to correct them if found to exist or attack as crude or inexpedient the action of the Commission in the performance of the administrative functions vested in it, and upon such assumption invoke the exercise of an unwarranted judicial power to correct the assumed evils." Interstate Commerce Commission v. Illinois Central Railway Company, 215 U.S. 452, 478. It was, of course, recognized in that case that there must be power in the Commission to make the order which might be subject to attack, but want of power was distinguished from the mere expediency or wisdom of making it, which, it was declared, was not open to judicial review.
We return therefore to the question of the power of the Commission and its purpose. The complainant before that body presented two issues, the effect of the rates from the Atlantic seaboard as discriminating against the Missouri River cities in favor of St. Paul and Minneapolis, and their unreasonableness of and in themselves. The first we may immediately put out of view. It was decided adversely to the complainants before the Commission, and we may say at the outset that the contention of the railroad *104 companies that it was the only issue presented to the Commission is not justified.
The second issue was decided in favor of the complainants, the Commission finding that the through rates were unreasonable of and in themselves, and was caused by the charge from the Mississippi River crossings to the Missouri River cities. The grounds of its decision and principles upon which it proceeded the Commission set forth in its report, and to some extent all of the factors upon which the decision is based and supported. Indeed, the pleadings in the case and the argument of counsel are but fuller explanations of the elements set out in the report. The controversy, therefore, is not so much as to what these factors are as what they establish as to the power of the Commission to make the order. The effect of the order, it is contended as we have seen, is to create artificial zones tributary to certain trade centers, or, as it is expressed by the railroad companies, the effect of the order is to destroy the system of rates which has existed ever since the railroads were constructed and to "overturn the equality of opportunity in competition" which certain commercial centers possessed under that system and to substitute an artificial system, the feature of which is special advantages in rates to special sections. And it is said the order was entered for such purpose. The appellee intervenors, who are merchants and jobbers of the territory known as the Central Freight Association territory, attack the order on the ground (a) that it violates § 2 of the Interstate Commerce Act, in that it compels a charged to them for like kind of traffic under substantially similar circumstances and conditions greater than is charged to their competitors in seaboard territory and on the Missouri River; (b) the order is in contravention of § 3, in that it gives an unreasonable preference to merchants and jobbers in the seaboard territory and on the Missouri River over merchants and jobbers in Central *105 Freight Association territory; (c) that it arbitrarily attempts to change existing commercial conditions upon which the various distributing centers of the seaboard, Middle West and West have become established; (d) the power of the Commission is limited to the reduction of unreasonable rates, and that the rates reduced are not shown to be such in themselves; (e) the order is void, it being an attempt at legislation on the subject of general adjustment of rates.
These contentions present the full offending of the order, and the summary of them is that rates long established have been changed, commercial conditions are disturbed, and equal opportunities of competition of certain commercial centers which have grown up have been taken away, and undue protection given to others. This seems very formidable in the recitation. But it is met by counter charges of discrimination, and that the equal opportunities of competition contended for is a power which has grown up and is supported by the existence of unjust freight rates. It is certain that the subject has taken on more complexity than it had before the Interstate Commerce Commission, and the Commission has made this the basis of a motion to dismiss the suit as to the intervening railroads, and all the intervening merchants and manufacturers, on the ground as to the railroads, among others, that the order does not run against or operate upon them, and that no right of theirs can be determined by the decree. On the ground as to the intervenors, that over the matters herein the courts exercise only the jurisdiction conferred by the act to regulate commerce, and not general equity powers, and that the matter to be determined is not the respective rights of shippers or localities, but the validity of the order of the Commission, and that the intervenors have a complete remedy by application to the Commission. And we may say here, as adding to the complex effect and interest of the questions *106 presented, that the chambers of commerce and boards of trade of certain Eastern cities have presented a brief in defense of the order, asserting a vital interest in its preservation, and exhibiting and illustrating the discrimination which, as they contend, exists against them by the breaking of rates at the Mississippi River crossings.
Let us see, therefore, upon what grounds the Commission proceeded. The Commission is accused by the railroad companies of attempting to substitute an artificial system of ratemaking for a long-established system, and to protect or foster particular localities of production and distribution. Certain remarks of the Commission are cited to support the charge. We think the charge puts out of view all else that was said by the Commission, puts out of view the comprehensive consideration the Commission took as exhibited in the explicit declaration made after quoting the local class rates between the rivers in cents per hundred pounds, that "these are the rates that are added to the rates up to the Mississippi River crossings to make up the through rates from the Atlantic seaboard to the Missouri River cities. Are these rates, as so used, and the through rates resulting therefrom, unwarrantably high or unduly discriminatory or unjustly prejudicial? Can they be changed without doing injustice elsewhere?"
We think the charge also puts out of view the disclaimers of such purpose in the answer of the Commission in its report to Congress, and its insistence that it is constrained by the law to act only on complaint to it and that it is open at all times to be appealed to to redress the grievances any shipper or locality may have. Nor did the Commission ignore or underestimate the manner in which the lines of railroads had been extended or the system of rates or ratemaking which had resulted. That is the system of making rates upon certain basing lines or points. Rates "break" at such points, it was proved as a result *107 of building independent lines westward. In other words, lines of railroads were built to certain cities from the East, seeking such cities, it may be, because of their natural situation and facilities, and other independent lines building westward, each line fixing its own rates or uniting according to circumstances in joint rates. It is the observance of such points that give and maintain, as we understand the contention of the railroads, to certain cities "the equal opportunity in the distribution of merchandise with the merchants in the East, and with the merchants to the West of said cities, so far as their business is affected by trade rates." That this was carefully considered is manifest, for the Commission resisted the argument which was made against basing rates on such points, saying:
"We are not impressed with the view that the system of making rates on certain basing lines should be abolished. No system of ratemaking has been suggested as a substitute for it, except one based upon the postage stamp theory, or one based strictly upon mileage. Either of these would create revolution in transportation affairs and chaos in commercial affairs that have been builded upon the system of ratemaking now in effect. It must not, however, be assumed that a basing line for rates may be established and be made an impassable barrier for through rates, or that cities or markets located at or upon such basing line have any inviolable possession of, or hold upon, the right to distribute traffic in or from the territory lying beyond. Development of natural resources, increase in population, growth of manufacturing or producing facilities, and increased traffic on railroads create changed conditions which may warrant changes in rates and in rate adjustments in order to afford just and reasonable opportunity for interchange of traffic between points of production and points of large consumption."
It was the sense of the Commission, however, that such *108 points could not be immovable forever and fixed forever against power of changing, or that through rates based on such points must be exempt from regulation, no matter what their character, or be constituted at the will of the railroad of the sum of local rates or the sum of rates from one basing point to another, however unjust the rates might be. Indeed, as pointed out in the brief of the appellants in No. 664, the railway companies adhere to no such construction of rates. As there said, "the Pacific coast terminal rates, the Washington and Spokane common point rates, the Oklahoma rates and the El Paso and Texas common point rates are each and all a departure therefrom, and all are much less than the rates ordered by the Commission."
As we have said, the Commission is the tribunal that is intrusted with the execution of the interstate commerce laws, and has been given very comprehensive powers in the investigation of and determination of the proportion which the rates charged shall bear to the service rendered, and this power exists, whether the system of rates be old or new. If old, interests will have probably become attached to them and, it may be, will be disturbed or disordered if they be changed. Such circumstance is, of course, proper to be considered and constitutes an element in the problem of regulation, but it does not take jurisdiction away to entertain and attempt to resolve the problem. And it may be that there cannot be an accommodation of all interests in one proceeding. This the Commission has realized and expressed. The Commission, meeting a possible suggestion that if the part of the through haul, which consisted of the rate between the rivers, was too high, all rates between the rivers might be too high, said:
"If the local class rates of defendants between the Mississippi and Missouri Rivers were reduced, it would give the same degree of advantage to all the producing and distributing centers on and east of the Missouri River, *109 and their relative advantages or disadvantages would not be changed, while a very serious inroad upon the revenues of the carriers would inevitably result, and at a time of industrial depression when it could not well be borne. Such a change would necessitate corresponding changes in the rates to and from intermediate points, and would probably be reflected in changes in commodity rates as well. The local class rates between the rivers are high, but this is not the time to precipitate such a violent change as would follow an important reduction of them. The first class rate from Buffalo to Chicago, about 540 miles, and from Pittsburg to Chicago, about 465 miles, is 45 cents. From Cincinnati to Chicago, 306 miles, it is 40 cents."
We may say in passing that the passage thus quoted is one of those which is adduced to support the contention that the Commission's purpose was to introduce a new system of ratemaking and build up certain distributing centers. We do not think so. It only shows that the accusation that all rates between the rivers were too high might be justified, but that it would be unjust to the carriers to reduce them at that time. It is somewhat strange that that which was done in the interest of the carriers should be brought forward by them to attack the action of the Commission. It is very clear that by a voluntary reduction by them of such rates the equality of opportunity dependent upon them would be restored. We make this observation to bring out clearly the relation of the railroad companies to the grievance complained of. That the companies may complain of the reduction made by the Commission so far as it affects their revenues is one thing. To complain of it as it may affect shippers or trade centers is another. We have said several times that we will not listen to a party who complains of a grievance which is not his. Clark v. Kansas, 176 U.S. 114, 118; Smiley v. Kansas, 196 U.S. 447.
But, it may be said, such limitations upon the companies *110 is not of consequence, for shippers and trade centers are here with complaints. It is doubtful if they are properly here, or rather were properly permitted to intervene. We have said that the act to regulate commerce was intended to be an effective means for redressing wrongs resulting from unjust discrimination and undue preference, and this must be so, whether persons or places be sufferers. T. & P. Railway Co. v. Abilene Oil Co., 204 U.S. 426. We have also said that the primary jurisdiction is with the Commission, the power of the courts being that of review and is confined in that review to questions of constitutional power and all pertinent questions as to whether the action of the Commission is within the scope of the delegated authority under which it purports to have been made. Interstate Commerce Commission v. Illinois Central R.R. Co., supra.
The order of the Commission besides is strictly limited. It was intended to determine nothing, and it determines nothing but that the through rates on Atlantic seaboard shipments to the Missouri River cities are too high. That order is alone open to review. Whether other persons, cities or areas of territory have grounds of complaint, the way is open by application to the Commission for inquiry and remedy. In that inquiry many elements may enter upon which the judgment of the Commission should first pass, and of which the courts should not be called upon in advance to intimate an opinion. The reasons for this we have indicated, and they will be found at length in the cases which we have cited.
One question remains for discussion, the finding of the Commission upon the character of the rate, whether it is unreasonable as decided. Such decision, we have said with tiresome repetition, is peculiarly the province of the Commission to make, and that its findings are fortified by presumptions of truth, "due to the judgments of a tribunal appointed by law and informed by experience." Illinois Central Railroad Company v. Interstate Commerce *111 Commission, 206 U.S. 454, and cases cited. The testimony in this case does not shake the strength of such presumptions. We have seen that the Circuit Court refrained from expressing an opinion upon anything but the power of the Commission. Circuit Judge Baker, dissenting from that view, went further and said:
"The complainants are common carriers whose rates on certain traffic are directed to be reduced by the order complained of. Two grounds for injunction are alleged. One is that the new rates are confiscatory. There is no proof whatever that the rates which the Commission prescribed as just and reasonable are not sufficient to pay the cost of handling that traffic, to cover that traffic's full proportion of maintenance and overhead expenses, and to return to the carriers an ample net profit. Furthermore, proof is lacking that, if the carriers should reduce other rates to correct what they claim is the maladjustment caused by the Commission's order, the reduction would not leave them abundant net returns. For the purpose of this hearing, therefore, it must stand as an agreed fact that the present reduction is neither directly nor indirectly obnoxious to the charge of taking private property without just compensation."
We concur in these conclusions.
Decree reversed and the case remanded with directions to dismiss the bill and all proceedings in the Circuit Court.
MR. JUSTICE WHITE dissenting.
The court below enjoined the execution of the order of the Commission because it was of the opinion that that body had exceeded the powers conferred upon it by the act to regulate commerce, since it had based its order upon the assumption that it was its duty under the act to secure a relatively equal share of the volume of interstate commerce to communities and places, and therefore that it was its province to alter otherwise legal rates for the *112 purpose of correcting the inequalities which otherwise would arise from the competitive rivalry between sections and places. As, in my opinion, the court below was correct in the view which it took of the order of the Commission, and was right in holding that the power which the order manifested was not conferred by law, I dissent from the judgment of reversal now announced. It does not, however, seem to me necessary that I should do more than state the fact of my dissent for the following reasons: The judgment of reversal is based, not upon the ruling that the Commission possessed the authority to make the order if it was based upon the assertion of power upon which the court below found the order must necessarily rest, but exclusively upon the theory that the court below, while rightly holding that the Commission had not the power which it assumed that body had exerted in making the order, had nevertheless mistakenly enjoined the order because it did not exert, or attempt to exert, the power which the court conceived had been called into play in making it. In other words, although the opinion now announced excludes the authority which the lower court deemed the Commission had exerted by the order in question, it nevertheless maintains the order because of the conclusion that the order was but an exertion by the Commission of its authority on complaint that a rate was unreasonable of itself, to correct such rate by substituting a reasonable rate therefor. Although I am unable to agree with the reasoning by which the court now gives to the order of the Commission the narrow basis thus stated, as the solution of that question depends upon the idiosyncrasies of this particular case and involves no principle of general importance, it seems to me I am called upon to do no more than simply to state my inability to agree.
MR. JUSTICE HOLMES and MR. JUSTICE LURTON join in this dissent.