**BALTIMORE & O. R. CO. et al. v.
UNITED STATES.
Civ. No. 5582.**

District Court, W. D. Pennsylvania.
May 27, 1946.

Anthony P. Donadio, of Baltimore, Md., Leo P. Day, of Chicago, Ill., Guernsey Orcutt, of Philadelphia, Pa., and Edward A. Kaier, of Chicago, Ill., for plaintiffs.

Charles F. Uhl, U. S. Atty., of Pittsburgh, Pa., and Edward Dumbauld, Sp. Asst. to Atty. Gen., for the United States.

Edward M. Reidy, Gordon C. Locke, and Daniel W. Knowlton, all of Washington, D. C., for Interstate Commerce Commission.

August G. Gutheim, of Washington, D. C., John Corcoran, of Pittsburgh, Pa., J. C. Argetsinger, of Youngstown, Ohio, for Western Pennsylvania Coal Operators Ass'n and Youngstown Sheet & Tube Co., intervening defendants.

James E. Bennett, of Youngstown, Ohio, for Youngstown Chamber of Commerce, intervening defendant.

T. H. Burgess, of Cleveland, Ohio, for Republic Steel Corporation, intervening defendant.

Before GOODRICH, Circuit Judge, and McVICAR and GOURLEY, District Judges.

GOODRICH, Circuit Judge.

Following an investigation of coal rates initiated by itself, the Interstate Commerce Commission has made certain orders with regard to freight rates on bituminous coal from points in Pennsylvania to the Youngstown, Ohio area. The plaintiff carriers are affected by the lowering of rates ordered by the Commission and now have appeared before a three-judge statutory court[1] to enjoin making the new rates effective. The case has been heard both upon oral argument and submission of briefs and the court has had before it the transcript of the proceedings before the Commission.

Four rates are involved. They are as follows:

1. The all-rail rate from Indianola and Russellton, in the Freeport district, to named destinations.

2. The all-rail rate from the Pittsburgh district to named destinations.

3. The all-rail rate from the Leetonia district.

4. The ex-river rate from Conway and Colona.

I. Rate from Indianola and Russellton in the Freeport District.

Upon this target plaintiffs have unleashed all their heavy artillery. The very number of objections made tends to make a court hearing them for the first time be at least skeptical of the seriousness with which some of them are advanced. They are nevertheless examined both as a whole and individually.

Ten major arguments are offered against the Freeport district rate. Analytically, these may be reduced to three of which one is so slight as to merit comparatively little attention even from the plaintiffs. Their complaints come down to: (a) attacks on comparative rates relied on by the Commission, "in part", in reaching its decision to lower the Indianola and Russellton rate; (b) charges that Republic Steel has been granted an arbitrary and discriminatory rate preference; (c) a charge that the Commission's cost studies were not complete enough.

Comparative Rates.

The first comparative rate whose applicability is questioned is that from the Freeport district to Greenville, Pa. The argument takes several forms. We are told that the distance there involved was not set out in the record. Perhaps it was not, at least not in so many words. But there was enough material in the record so

---

[1] 28 U.S.C.A. § 41(28). See, also, 28 U.S.C.A. §§ 43–48.

that the Commission could and did determine distance by the simple process of addition and subtraction.[2] We are also told that the railroad petitioners had no opportunity to prove that the Greenville rate applied to less distant points as well and hence was allegedly unfair as a standard of comparison. Furthermore, it is contended this constituted "acting without evidence" on the part of the Commission. The fact is that the railroads in one of their own exhibits [3] indicate that the Greenville rate applies to intermediate points also.[4]

■■ Another rate whose comparative value is questioned by the railroads is that from mines on the Butler Branch of the B. & O. to Youngstown and other points in Ohio and Pennsylvania. The railroads contend that this rate applies to less distant points as well. That familiar argument, however, only goes to the weight of the evidence and that is not a question for court review. They also argue that they offered to prove that the movement to Youngstown on the route whose rate was used as a comparison was negligible. The record already showed movements prior to 1943. In 1944 the record closed and figures subsequent to July of that year had to be excluded. The Commission had evidence enough before it to exercise its discretion validly. Equally within the discretion of the Commission was its use of short-line distances as opposed to average distances for a basis of comparison. Thus the fact that the short route from origin over the Bessemer & Lake Erie to Butler, thence to destination by B. & O., was utilized as a standard by the Commission is not indicative of error in law, as contended by the petitioners. The railroads stress the principle previously laid down by the Commission that "A carrier with a long route is not obliged as a matter of law to meet the rate of a short-line competitor." Commercial Coal Co. v. Baltimore & O. R. Co., 15 I.C.C. 11, 14, and other cases to similar effect. It should be noted that the new Freeport rate ($1.32) does not meet the short haul rate ($1.17); on the contrary it still substantially exceeds it. The average distance on the former rate is 90.4 miles while on the latter rate it is 76.5 miles. The old Freeport rate was $1.42 and the Commission considered the spread too large. It therefore exercised its judgment to the extent of a 10 cent decrease, still leaving a 15 cent spread in favor of the longer haul.

It is alleged that in making the Greenville comparison the Commission arbitrarily disregarded the fact that the Freeport district to Youngstown rate applies also to Warren and Niles which are more distant. The Commission answers by pointing to a 9 cent differential in favor of the Freeport district over Greenville.[5] This shows, we think, an absence of arbitrary action and the existence of a considered judgment upon the matter.

■ The new rate is also questioned because based on a policy of the Bessemer & Lake Erie to make lower rates from the Freeport district than the Pittsburgh district. The railroads object that no proof of such policy appeared in the record. While no one so testified, again this was a matter which could be inferred from other material to be found there. There is no error in making such inferences.

Preferential Rate.

■ The charge that Republic Steel has been given a discriminatory preference is made. It rests on the fact that the new

[2] Thus, Exhibit No. 6 shows a distance of 79.5 miles to Shenango while Exhibit No. 49 shows Greenville 1.9 miles from Shenango. Hence an average distance of 81.4 miles to Greenville. Both exhibits were introduced by petitioners, the railroads, themselves.

[3] Exhibit No. 49, referred to in footnote above.

[4] While the objection to the Greenville rate as a comparison was first used by the railroads in the exceptions to the examiner's proposed report, the railroads' evidence was already in the record for other purposes. It consisted mainly of the locations of the various points to which the new and the comparative rates applied. The weight of that evidence was for the Commission to decide.

[5] The Commission, in its report on reconsideration, said, "Due allowance was made for this circumstance as well as for the single-line haul to Greenville in contrast to the two-line movement to the Youngstown district in making the rate to the latter district 9 cents higher than the Greenville rate."

Freeport district rate is applied to Indianola and Russellton where Republic's captive mines are situated. The implication is that only these two centers in that district may use the lower rate. Actually, however, all but one of the mines in the Freeport district are intermediate to Indianola and Russellton and hence of necessity use the same new rate. As to the remaining mine, nothing prevents it from making its argument for a lower rate, as Republic Steel did. The Commission is not constrained to settle all controversies in one proceeding. Nor is Republic Steel required to show that it is or is not the only one entitled to the new rate. It need not prove a case for anyone but itself. Finally, there is serious doubt that the railroads have standing to urge the point of preference of one steel mill over others. Interstate Commerce Commission v. Chicago, Rock Island & Pacific Ry. Co., 1910, 218 U.S. 88, 109, 30 S.Ct. 651, 659, 54 L.Ed. 946.[6] If a grievance exists, it is on the part of other shippers who do not get as good a rate as they are entitled to; not the road which carries the freight.

Cost Studies.

The remaining point of attack on the Freeport district rate is that the cost studies presented in the record were deficient because it was not shown that the reduction in rates was based on lower costs in that area. The simple answer is that Republic Steel did not have to make such a showing and the Commission did not have to consider it unless shown. The Commission is not limited to the kind of evidence

it must consider. It need only meet the test of sufficient evidence taken as a whole.

The general factors of cost are inevitably covered in any consideration of distance and operating conditions since these are inescapable and important determinants of cost variations. These are better left to a discussion of sufficiency of the evidence. In its original report the Commission did specifically discuss "other cost evidence" which it had considered in addition to the general factors. To what extent cost studies are helpful depends on the particular circumstances of a case. System-average ton-mile and car-mile costs, for example, may be wholly without value as to a particular commodity.[7] The Commission has said before and repeats in this opinion that these studies "are interesting and to a certain extent useful as general guides, but which cannot be relied upon as decisive factors". In short, the Commission has given such weight to cost factors as in its judgment as a skilled body those factors were entitled to have, and no more.

Sufficiency of Evidence.

Since the question of the Commission's powers is a constantly recurring one affecting not only the Freeport rate but the others as well it might be of some value to look at the mass of evidence and determine whether it is sufficient in general to permit the exercise of those powers.[8]

The first report issued by the Commission dealing with the rates under considera-

---

[6] "That the companies may complain of the reduction made by the Commission so far as it affects their revenues is one thing. To complain of it as it may affect shippers or trade centers is another. We have said several times that we will not listen to a party who complains of a grievance which is not his."

[7] The Commission in its first report states: "Without question system-average ton-mile and car-mile costs are an imperfect index of the expense of hauling individual commodities, although they are sometimes used by rail carriers in fourth-section applications for the purpose of showing proposed rates to be compensatory. See Coke and Coke Products, 215 I.C.C. 665, 669. In proceedings of other kinds also they have occasionally been

given some weight where the nature of the particular commodity under consideration and the circumstances surrounding its movement are fairly typical of the average traffic. For example, in Boileau v. Pittsburgh & L. E. R. Co., 22 I.C.C. 640, the lake-cargo coal rate of the carriers which are the principal respondents here was in issue, and we observed that the statistical evidence based on system-average operating expense tended to show that the cost of transporting the coal was probably less than one-half of the existing rate."

[8] "Power to make the order, and not the mere expediency or wisdom of having made it, is the question." Interstate Commerce Commission v. Illinois Central R. Co., 1910, 215 U.S. 452, 470, 30 S.Ct. 155,

tion shows that evidence. Bituminous Coal To The Youngstown District, 1945, 263 I.C.C. 683. The Commission examined the rate and traffic history on both an all-rail and on an ex-river basis. All the parties were heard in the proceedings[9] and their principal contentions noted in the report. Transportation conditions were considered at some length with particular emphasis on comparative distances involved, the line-haul operating circumstances, origin service at coal mines, service at ex-river terminals, ex-river railroad haul of coal, terminal service at destination and various cost evidences evaluated as to weight as already noted. The Commission made rate studies between the routes in question and comparable routes elsewhere. These studies were supplemented by examination of the relation of Youngstown rates to the others and the effect of Youngstown rate changes upon them. The Freeport rate was considered on its own merits. In concluding, the Commission restated the case separately for each of the districts: Leetonia, Freeport, Pittsburgh, Conway and Colona. On the basis of this evidence the Commission made its findings as to new rates.

 There is no doubt in our minds that there was substantial evidence here upon which to predicate rate modifications. How well that material was utilized or what weights were assigned to its various parts is not a matter upon which this Court may rule. Interstate Commerce Commission et al. v. City of Jersey City et al., 1944, 322 U.S. 503, 512, 513, 64 S. Ct. 1129, 88 L.Ed. 1420. The problems of rate adjustment are empiric, fluid and complex. They are not to be shifted from the shoulders of the experts commissioned to handle them to the backs of the judiciary; nor are the broad powers of judgment conferred upon the experts to be unduly hampered. Western Paper Makers' Chemical Co. et al. v. United States, 1926, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941. Correctness of reasoning, soundness of conclusion or alleged inconsistency of findings with those of prior proceedings

are not to be inquired into by the courts. Virginian Ry. Co. v. United States, 1926, 272 U.S. 658, 665, 666, 47 S.Ct. 222, 71 L. Ed. 463.

It will be recalled that in making their objections to the comparative rates, the railroads prefaced their argument by stating that the new rate was "predicated in part" upon such comparison. A similar thread runs through most of the railroads' contentions. Whether the sum total of evidence other than those matters objected to or even including them, was still sufficient to enable the Commission to draw effective conclusions was not met by such argument.

II. Pittsburgh District Rate.

The principal arguments advanced against the new Pittsburgh rate are those already discussed in dealing with the questions involved in the rates from the Freeport District. The Pittsburgh rate is attacked because it is based on the Indianola-Russellton to Youngstown reduction and on the rate comparison with the Butler Branch rates. Both these rates have already been discussed. Since they have been sustained, the Pittsburgh rate is to the same extent sustained.

The remaining contention urged against the Pittsburgh rate is that it is void because it embraces the theory that the Pittsburgh to Youngstown lines are of superior construction to the Butler Branch lines. The flaw in this, it is argued, is lack of evidence of the Butler Branch construction and insufficient evidence of the Pittsburgh to Youngstown construction. Of the latter, there was testimony in the record from which the Commission could draw conclusions. As to the former, the new differential in rates still greatly favors Pittsburgh over Butler Branch. Finally we do not find that the Commission made type of construction the determinative factor in reaching its conclusion.

III. Leetonia District Rate.

Plaintiffs' brief does not even argue the validity of this rate though the petition itself does attack it. The rate is substan-

---

160, 54 L.Ed. 280. The scope of judicial review of Commission orders had been set out as indicated even before the pas-

sage of the Urgent Deficiencies Act of 1913. See Note 1.

[9] The Commission had before it 1094 pages of testimony and 92 exhibits.

tially supported in evidence. In Pittsburgh, L. & W. R. Co. Practices, 227 I.C.C. 73 the rate from that portion of the Leetonia district here involved was set subject to a differential of 50 cents less than the Pittsburgh rate. If the Pittsburgh rate is correct, Leetonia is also. It should be added that the 50 cent differential was in the instant case lowered to 48 cents, which brings the new rate into line with the 84 cent rate prescribed in the Practices case, supra, plus the 5 cent general increase since authorized.

## IV. Ex-River Rates.

The railroads contend that the new ex-river rates order is unlawful because based, in part, on erroneous construction of 1940 amendments to the Interstate Commerce Act. They derive this from certain language [10] in the second report of the Commission in this case, made upon reconsideration for the purpose of affecting minor modifications of findings. Simply stated the argument comes down to this:

(a) the old rates were based on the Transportation Act of 1920

(b) the new rates are based on the 1940 amendments to that Act

(c) therefore, if we can show that the amendments do not change the basic policy of the Act we have demonstrated an error of law in the Commission's thinking.

The fallacy may be demonstrated with equal simplicity. The argument assumes that the legal misconception (if there was one) comes at the new level rather than the old and that is not the case. Examination of the decision that established the old rate shows that the Commission was concerned with whether the advantages of river mines "should further be enhanced to the detriment of the inland mines by the establishment of ex-river rates so low as to eliminate the inland mines from competition". Bituminous Coal to Youngstown, 1933, 197 I.C.C. 617, 633. The sentence concludes by saying that this "merits careful consideration" and the decision goes on to discuss the "policy of Congress as declared in section 500". We need not now determine whether the Commission was in error in so interpreting section 500 as to make inland versus river mine competition a decisive factor. It is enough to point out that the Supreme Court in Mississippi Valley Barge Line Co. v. United States et al., 1934, 292 U.S. 282, 288, 54 S.Ct. 692, 694, 78 L.Ed. 1260, interpreted section 500,[11] saying that establishment of rail rates "affects the carriers by rail alone, at least in its immediate consequences." Therefore the Commission need not exhibit the over-solicitous regard for consequences to competing media which led to the old rates in the decision previously mentioned. Freed

---

[10] The language of the Commission reads:

"Our second decision [which established the present ex-river rates] in the ex-river proceeding moreover was influenced to a considerable extent by section 500 of the Transportation Act of 1920. Subsequent amendments to the Interstate Commerce Act in 1940, particularly the addition of the proviso to section 3(1) must now be given effect."

Section 500 of the Transportation Act of 1920 provides in part: "It is declared to be the policy of Congress to promote, encourage, and develop water transportation, service, and facilities in connection with the commerce of the United States, and to foster and preserve in full vigor both rail and water transportation." 49 U.S.C.A. § 142.

Section 3(1) provides, in part: "It shall be unlawful for any common carrier * * * [to] cause any undue or unreasonable preference or advantage * * *;

or to subject any [person, locality or type of traffic] to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description." 49 U.S.C.A. § 3(1).

[11] "The admonition does not mean that carriers by rail shall be required to maintain a rate that is too high for fear that through the change they may cut into the profits of carriers by water. The most that it can mean, unless, conceivably, in circumstances of wanton or malicious injury, is that where carriers by land and water are brought within the range of the regulatory powers of the Commission, as e. g., in establishing through routes or joint rates, there shall be impartial recognition and promotion of the interests of all."

968

of this self-imposed restraint[12] the Commission could, granting sufficient evidence of course, lower the rates as it did.

■ The railroads contend that the ex-river rate reduction is unlawful because there were no findings of a difference in conditions requiring a lower level here than at the all-rail level. Prefatory to any reply it might be pointed out that removal of the self-imposed limitation which bulked large in producing the old rate, is in itself a change of conditions. The answer, however, is that there is no all-rail level here. There are no mines at Conway and Colona; the traffic is river generated. The question of evidence for us is simply whether there was enough information about comparable rates elsewhere for conclusions to be drawn. That there was such evidence is abundantly clear from reading the report of the Commission. The weight assigned to that evidence, we must reiterate, is not for us to consider; if the scales are faulty we cannot correct them.

Equally a matter of weighing evidence is the charge that, in part, the findings are not adequate to support the order. The Commission says the 85 cent rate in American Rolling Mill Co. v. Baltimore & Ohio R. Co., 1931, 173 I.C.C. 357 "affords a criterion" for the new ex-river rate of 80 cents here. The railroads reply that the conditions offsetting the 7 mile difference in weighted-average haul between the two rates are subject to strong rebuttal. The conditions considered were tonnage, number of carriers, number of shippers and number of delivery points. Even though we were to agree with the railroads' evaluation of these points, it is the Commission and not we who must decide whether they are worth a 5 cent lower differential or none at all or even a higher differential. Nor can we, as the railroads urge, go

beyond the American Rolling Mill case and apply the evidence there considered to this case. The conclusions there reached have valid applicability for comparative purposes here. The Commission has chosen to apply them and we cannot force the Commission to utilize the parents or grandparents of those conclusions.[13]

The railroads object to the Glenwood and Jack's Run rates as comparative evidence. Again the question is one of weight. Even though these rates were depressed to meet market competition, that does not mean the Commission must be blind to them. It is privileged to examine them with all the other evidence and assign them their proper worth, which as a skilled body especially created for such function the Commission must be presumed capable of doing.

The plaintiffs' prayer for injunction must be dismissed.

---

[12] It is interesting to note that the brief for the Commission and the government states "It seems clear that the statement[s] of national transportation policy * * * are inconsistent with the reliance on section 500 in the former decision."

[13] In reaching its result in American Rolling Mill the Commission used 85 percent of the scale of rates prescribed in Holmes & Hallowell Co. v. Great North-

ern Ry. Co., 69 I.C.C. 11. The railroads reason that the American Rolling Mill's decision is being misapplied as a criterion, if the same 85 percent of the Holmes & Hallowell scale is not used here. If it were so used the new rate would be even higher than the old rate. The reductio ad absurdum of this reasoning would make the first decision rendered by the I.C.C. determinative of all future decisions.