# SOUTHERN PACIFIC RAILROAD COMPANY *v.* UNITED STATES.

# UNITED STATES *v.* SOUTHERN PACIFIC RAILROAD COMPANY.

## CROSS APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

Nos. 18 and 24. Argued January 29, 30, 1901.—Decided January 6, 1902.

The title of the Southern Pacific Railroad Company to the lands in controversy in this suit was acquired by virtue of the act of July 27, 1866, 14 Stat. 292, and the construction of the road was made under such cirstances as entitle the company to the benefit of the grant made by the eighteenth section of that act.

The settled rule of construction is that where by the same act, or by acts of the same date, grants of land are made to two separate companies, in so far as the limits of their grants conflict by crossing or lapping, each company takes an equal undivided moiety of the lands within the conflict, and neither acquires all by priority of location or priority of construction.

It is well settled that Congress has power to grant to a corporation created by a State additional franchises, at least of a similar nature.

The grant to the Southern Pacific and that to the Atlantic and Pacific both took effect, and both being *in præsenti,* when maps were filed and approved they took effect by relation as of the date of the act.

The United States having by the forfeiture act of July 6, 1886, become possessed of all the rights and interests of the Atlantic and Pacific Com-

pany in this grant within the limits of California, had an equal undivided moiety in all the odd-numbered sections which lie within the conflicting place limits of the grant to the Atlantic and Pacific Company and of that made to the Southern Pacific Company by the act of July 27, 1866, and the Southern Pacific Company holds the other equal undivided moiety thereof.

The case is stated in the opinion of the court.

*Mr. Joseph H. Call* for the United States.

*Mr. Maxwell Evarts* and *Mr. L. E. Payson* for appellants.

Mr. Justice Brewer delivered the opinion of the court.

On May 14, 1894, the United States filed in the Circuit Court for the Southern District of California a bill of complaint against the Southern Pacific Railroad Company, (hereinafter called the Southern Pacific,) and others, seeking to have certain patents canceled and their title quieted to a large body of land, including those described in said patents. Upon pleading and proofs a decree was entered in favor of the United States on June 6, 1898, quieting their title to most of the lands described in the bill. 86 Fed. Rep. 962. Cross appeals were taken from such decree to the Circuit Court of Appeals for the Ninth Circuit, by which court the decree was affirmed on October 2, 1899. 98 Fed. Rep. 27. From such decree of affirmance both parties have appealed to this court.

The lands in controversy were within the grant made July 27, 1866, c. 278, 14 Stat. 292, to the Atlantic and Pacific Railroad Company, (hereinafter called the Atlantic and Pacific,) in aid of its projected line from Springfield, Missouri, to the Pacific Ocean, and were situated along that line between the eastern boundary of California and the Pacific Ocean. The Southern Pacific claims title to these lands by virtue of the eighteenth section of that act and its proceedings thereunder, had with the express approval of Congress.

Litigation has heretofore been had between the United States and the Southern Pacific in reference to lands along the line of

the Atlantic and Pacific, the result of which litigation will be found in the following decisions of this court: *United States v. Southern Pacific Railroad Company,* 146 U. S. 570; *United States* v. *Colton Marble & Lime Company,* and *United States v. Southern Pacific Railroad Company,* 146 U. S. 615, and *Southern Pacific Railroad Company* v. *United States,* 168 U. S. 1. Those decisions are claimed by the Government to be controlling of this case on the principle of *res judicata.*

There are, therefore, two distinct questions presented for our consideration: First, whether the Southern Pacific took any title to these lands by virtue of the act of 1866 or subsequent legislation? and, second, do the prior decisions of this court control the determination of this case?

With reference to the first question, a further statement of facts is necessary. The act of 1866 chartered the Atlantic and Pacific, empowered it to build a railroad from Springfield in Missouri to the Pacific Ocean, the description of the latter part of the route being in these words:

"Thence along the thirty-fifth parallel of latitude, as near as may be found most suitable for a railway route, to the Colorado River, at such point as may be selected by said company for crossing; thence by the most practicable and eligible route to the Pacific."

By the third section a grant of lands was made to said company in these words:

"SEC. 3. *And be it further enacted,* That there be, and hereby is, granted to the Atlantic and Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, . . . every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the Territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any State, and whenever, on the line thereof, the United States have full title, not reserved, sold, granted or otherwise appropriated, and free from preëmption or other claims or rights, at the time the line

of said road is designated by a plat thereof filed in the office of the Commissioner of the General Land Office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers, or preëmpted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections and not including the reserved numbers."

The company filed its map of definite location in 1872, but never did any work in the way of constructing that part of its road from the Colorado River, that being the eastern boundary of California, to the Pacific Ocean. On July 6, 1886, Congress passed an act forfeiting the lands granted to the Atlantic and Pacific, so far as they were adjacent to and coterminous with the uncompleted portions of the road. 24 Stat. 123, c. 637. By this act the interest of the Atlantic and Pacific in public lands in the State of California was divested and restored to the United States.

On December 2, 1865, the Southern Pacific was incorporated under the laws of California, "for the purpose of constructing, owning and maintaining a railroad from some point on the Bay of San Francisco in the State of California, and to pass through the counties of Santa Clara, Monterey, San Luis Obispo, Tulare, Los Angeles and San Diego to the town of San Diego in said State, thence eastward through the said county of San Diego to the eastern line of the State of California, there to connect with a contemplated railroad from said eastern line of the State of California to the Mississippi River."

Section 18 of the act of 1866 reads as follows:

"*And be it further enacted*, That the Southern Pacific Railroad, a company incorporated under the laws of the State of California, is hereby authorized to connect with the said Atlantic and Pacific Railroad, formed under this act, at such point, near the boundary line of the State of California, as they shall deem most suitable for a railroad line to San Francisco, and shall have a uniform gauge and rate of freight or fare with said

road; and in consideration thereof, to aid in its construction, shall have similar grants of land, subject to all the conditions and limitations herein provided, and shall be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific Railroad herein provided for."

On January 3, 1867, the Southern Pacific filed in the Interior Department a map of a route from San Francisco via Mojave to Needles, on the Colorado River. This line from Mojave to Needles is on the same general course and contiguous to that adopted by the Atlantic and Pacific. The Secretary of the Interior refused to accept or approve the map on the ground that this particular part of the line was not authorized by the charter of the Southern Pacific. On April 4, 1870, the legislature of California passed the following act:

" Whereas, by the provisions of a certain act of Congress of the United States of America, entitled 'An act granting lands to aid in the construction of a railroad and telegraph line from San Francisco to the eastern line of the State of California,' approved July 27, 1866, certain grants were made to, and certain rights, privileges, powers and authority were vested in and conferred upon the Southern Pacific Railroad Company, a corporation duly organized and existing under the laws of the State of California, therefore, to enable the said company to more fully and completely comply with and perform the requirements, provisions and conditions of the said act of Congress, and all other acts of Congress now in force, or which may hereafter be enacted, the State of California hereby consents to said act; and the said company, its successors and assigns, are hereby authorized and empowered to change the line of its railroad so as to reach the eastern boundary line of the State of California by such route as the company shall determine to be the most practicable, and to file new and amendatory articles of association, and the right, power and privileges hereby granted to, conferred upon and vested in them, to construct, maintain and operate, by steam or other power, the said railroad and telegraph line mentioned in said act of Congress, hereby confirming to and vesting in the said company, its successors and assigns, all the rights, privileges, franchises, power and authority

conferred upon, granted to or vested in said company by the said acts of Congress and any act of Congress which may be hereafter enacted." Statutes, California, 1869–70, p. 883.

And on June 28, 1870, Congress passed the following joint resolution, 16 Stat. 382 :

" *Be it resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Southern Pacific Railroad Company of California may construct its road and telegraph line, as near as may be, on the route indicated by the map filed by said company in the Department of the Interior on the third day of January, eighteen hundred and sixty-seven ; and upon the construction of each section of said road, in the manner and within the time provided by law, and notice thereof being given by the company to the Secretary of the Interior, he shall direct an examination of each such section by commissioners to be appointed by the President, as provided in the act making a grant of land to said company, approved July twenty-seventh, eighteen hundred and sixty-six, and upon the report of the commissioners to the Secretary of the Interior that such section of said railroad and telegraph line has been constructed as required by law, it shall be the duty of the said Secretary of the Interior to cause patents to be issued to said company for the sections of land coterminous to each constructed section reported on as aforesaid, to the extent and amount granted to said company by the said act of July twenty-seventh, eighteen hundred and sixty-six, expressly saving and reserving all the rights of actual settlers, together with the other conditions and restrictions provided for in the third section of said act."

Along this general line the Southern Pacific constructed its road. As California said, in reference to the grant made to the Southern Pacific by section 18 of the act of Congress of July 27, 1866, that it " hereby consents to said act," and as Congress, by its resolution, approved the route selected by the Southern Pacific as a route authorized by that act, no one can question that the construction of the road was under such circumstances as entitle the company to the benefit of the grant made by said eighteenth section of the act of 1866.

By the act of 1866, Congress made grants of land to two different companies; by the third section to the Atlantic and Pacific, and by the eighteenth section to the Southern Pacific. The settled rule of construction is that where by the same act, or by acts of the same date, grants of land are made to two separate companies, in so far as the limits of their grants conflict by crossing or lapping, each company takes an equal, undivided moiety of the lands within the conflict. Neither acquires all by priority of location or priority of construction. *St. Paul & Sioux City Railroad* v. *Winona & St. Paul Railroad*, 112 U. S. 720; *Sioux City Railroad* v. *Chicago Railroad*, 117 U. S. 406; *Donahue* v. *Lake Superior Canal &c.*, 155 U. S. 386; *Sioux City &c. Railroad* v. *United States*, 159 U. S. 349.

The question as to the two grants under this act of 1866 was presented to Mr. Justice Lamar, at that time Secretary of the Interior, and his ruling to the same effect appears in a letter of instructions to the acting Commissioner of the General Land Office on November 25, 1887. 6 Land Dec. 349. In that letter he said :

"The Southern Pacific Company located its main line January 3, 1867, and by the terms of the grant its right immediately attached to every odd section of land, not of the character excepted by the grant, and within the ten-mile limit, subject, however, to be divested to the extent of a half interest in every such odd section that might fall within the common limits of both roads, after the filing of the map of definite location by the Atlantic and Pacific Company.

"The Atlantic and Pacific Company filed its map of definite location April 11, 1872, and April 16, 1874, showing that the primary or granted limits of said road overlapped and conflicted with the primary or granted limits of a portion of the Southern Pacific road. As to the lands falling within the granted limits of both roads, the filing of the map of definite location by the Atlantic and Pacific Company, showing such conflict, immediately divested the Southern Pacific Company of the right and title to a half interest in all such odd sections, and from that moment and by that act the two companies became entitled to equal, undivided moieties in such sections, without regard to

the priority of location of the line of the road, or priority of construction; the right of each company relating back to the date of the grant. *St. Paul & Sioux City Railroad* v. *Winona & St. Paul Railroad*, 112 U. S. 720; *Sioux City Railroad* v. *Chicago Railroad*, 117 U. S. 406."

As against this, it is contended that Congress could not have intended a road running from the western to the eastern border of California, parallel and contiguous to the Atlantic and Pacific road; that it must have intended a connection between the two roads on the western boundary or border of the State —especially in view of the fact that the charter of the Southern Pacific contemplated only a line along the western part of the State from San Francisco to San Diego. Whatever doubts there might be in respect to this matter are removed by the action taken by the Southern Pacific and the resolution of June 28, 1870. The railroad company assumed that it had a right under the act of 1866 to locate a line to the eastern boundary of California, and did locate such a line, and filed a map thereof with the Secretary of the Interior, and Congress by the joint resolution of June 28 in effect accepted and approved that line, and declared that the railroad company might construct its road on the route indicated on that map.

Neither is the date of this resolution the time at which the rights of the railroad company arose, as is contended by counsel. No new land grant was contemplated; no substitution of one grant for another, or of one line for another. The obvious purpose was to accept the line proffered by the road as the line intended by the act of 1866, and the grant made by the act of 1866 was recognized as rightfully to be used in aid of the construction of a road along the line suggested by the company.

Neither is it material whether the line indicated on the map filed is to be taken as a line of general route or of definite location, for in fact the road was constructed along that line, "as near as may be," in the language of the resolution, and the road has been accepted by the Government.

Neither does the fact that the line of road contemplated by the Southern Pacific's charter, at the time of the passage of the act of 1866, was along the western border of the State, prevent

the operation of the grant. It is well settled that Congress has power to grant to a corporation created by a State additional franchises—at least franchises of a similar nature. *Sinking Fund Cases,* 99 U. S. 700, 727; *Pacific Railroad Removal Cases,* 115 U. S. 1, 15; *California* v. *Central Pacific Railroad,* 127 U. S. 1; *United States* v. *Stanford,* 161 U. S. 412, 431; *Central Pacific Railroad* v. *California,* 162 U. S. 91, 118, 123.

In *California* v. *Pacific Railroad Company, supra,* this very grant was before the court, and Mr. Justice Bradley, on page 44, having theretofore narrated the facts in reference to various charters and grants, said:

" An examination of the acts referred to in these findings shows that Congress authorized the Southern Pacific Railroad. Company to connect with the Atlantic and Pacific Railroad, at such point near the boundary line of the State of California, as it should deem most suitable for a railroad line to San Franciso; and, to aid in the construction of such a railroad line, Congress declared that the company should have similar grants of land, and should be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific. Like powers were also given to the Southern Pacific Railroad Company to construct a line of railroad from Tehachapa Pass, by way of Los Angeles, to the Texas Pacific road at the Colorado River (Fort Yuma). The Southern Pacific Company was not authorized by its original charter to extend its railroad to the Colorado River, as we already know by other cases brought before us, and as appears by the act of the state legislature passed April 4, 1870, which assumed to authorize the company to change the line of its railroad so as to reach the eastern boundary line of the State; thus duplicating the power given to it by the act of Congress. (See the state act quoted in 118 U. S. 399.) This state legislation was probably procured to remove all doubts with regard to the company's. power to construct such roads. It is apparent, however, that the franchise to do so was fully conferred by Congress, and that franchise was accepted, and the roads have been constructed in conformity thereto."

We are of the opinion, therefore, that Mr. Secretary Lamar

was right in his conclusion that both the grant to the Southern Pacific and that to the Atlantic and Pacific took effect, and being by the same act, so far as there was a conflict, the two companies took equal, undivided moieties of the land.

We pass, therefore, to a consideration of the second question: Do prior decisions of this court control the determination of this case? . *United States* v. *Southern Pacific Railroad Company*, 146 U. S. 570; *United States* v. *Colton Marble & Lime Co.*, and *United States* v. *Southern Pacific Railroad Company*, 146 U. S. 615, and *Southern Pacific Railroad Company* v. *United States*, 168 U. S. 1, are referred to. Those cases were brought by the United States against the Southern Pacific to quiet title to certain lands (but not the lands in controversy here) along the line of the Atlantic and Pacific within the State of California. In the last of these three cases the principle of *res judicata* was invoked and held applicable; and the title of the Government to the lands involved was sustained on the ground that the question in controversy had been finally determined in the prior suits. In the opinion filed there was much discussion in respect to *res judicata*, and it was said, on page 48.:

" The general principle announced in numerous cases is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction, as a ground of recovery, cannot be disputed in a subsequent suit between the same parties or their privies; and even if the second suit is for a different cause of action, the right, question or fact once so determined must, as between the same parties or their privies, be taken as conclusively established so long as the judgment in the first suit remains unmodified."

See also *New Orleans* v. *Citizens' Bank*, 167 U. S. 371, 396, in which the rule was thus stated:

"The estoppel resulting from the thing adjudged does not depend upon whether there is the same demand in both cases, but exists, even although there be different demands, when the question upon which the recovery of the second demand depends has under identical circumstances and conditions been previously concluded by a judgment between the parties or their privies."

It becomes, therefore, important to determine what was decided in the prior cases, and in order to a clear understanding these additional facts must be borne in mind: On March 3, 1871, Congress passed an act, 16 Stat. 573, to incorporate the Texas and Pacific Railroad Company, the twenty-third section of which reads:

" That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized (subject to the laws of California) to construct a line of railroad from a point at or near Tehachapa Pass, by way of Los Angeles, to the Texas Pacific Railroad at or near the Colorado River, with the same rights, grants and privileges, and subject to the same limitations, restrictions and conditions as were granted to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six: *Provided, however*, That this section shall, in no way affect or impair the rights, present or prospective, of the Atlantic and Pacific Railroad Company or any other railroad company."

On April 3, 1871, the Southern Pacific filed a map of a route from Tehachapa Pass southward by way of Los Angeles to connect with the Texas and Pacific Railroad at the Colorado River, and subsequently constructed a road on such line. This line crossed that of the Atlantic and Pacific, the general course of the former being north and south and of the latter east and west. The grants, therefore, to the Atlantic and Pacific by the act of July 27, 1866, and that to the Southern Pacific by the act of March 3, 1871, came in conflict at or near the place of intersection of their lines. The lands in controversy in those suits were lands within the granted limits of both companies at the place of conflict. It was so distinctly stated in the opening of the opinion in the first case referred to:

" The question to be considered is not as to validity of the grant to the Southern Pacific Company, but only as to its extent. It may be conceded that the company took title to lands generally along its line, from Tehachapa Pass to its junction with the Texas and Pacific; and the contention of the Government is here limited to those lands only which lie within

the granted limits of both the Atlantic and Pacific and the Southern Pacific Companies, at the crossing of their lines, as definitely located." p. 592.

Both grants were grants *in præsenti,* and when the maps of definite location were filed and approved the grants took effect by relation as of the dates of the acts. Hence, if each company filed a map of definite location the title of the Atlantic and Pacific, relating back to the year 1866, was anterior and superior to that of the Southern Pacific, of date 1871, and all the lands within the conflict passed to the Atlantic and Pacific rather than to the Southern Pacific. To avoid the effect of this conclusion—a conclusion resting upon well-settled principles of public land law—the Southern Pacific contended that no map of definite location was ever filed by the Atlantic and Pacific, or approved by the Secretary of the Interior, but after a full examination of the facts this court held otherwise, summing up its conclusions in these words:

" Our conclusions, therefore, are, that a valid and sufficient map of definite location of its route from the Colorado River to the Pacific Ocean was filed by the Atlantic and Pacific Company, and approved by the Secretary of the Interior ; that by such act the title to these lands passed, under the grant of 1866, to the Atlantic and Pacific Company, and remained held by it subject to a condition subsequent until the act of forfeiture of 1886 ; that by that act of forfeiture the title of the Atlantic and Pacific was retaken by the General Government, and retaken for its own benefit, and not that of the Southern Pacific Company ; and that the latter company has no title of any kind to these lands." p. 607.

So, in the opinion in the last of the three cases, is this statement of the facts and question.

" The principal contention of the United States is that the lands in dispute are in the same category in every respect with those in controversy in *United States* v. *Southern Pacific Railroad,* 146 U. S. 570, and *United States* v. *Colton Marble & Lime Co.,* and *United States* v. *Southern Pacific Railroad,* 146 U. S. 615 ; and that, so far as the question of title is concerned, the judgments in those cases have conclusively determined, as

between the United States and the Southern Pacific Railroad Company and its privies, the essential facts upon which the Government rests its present claim.

" Stated in another form, the United States insists that in the former cases the controlling matter in issue was, whether certain maps filed by the Atlantic and Pacific Railroad Company in 1872, and which were accepted by the Land Department as sufficiently designating that company's line of road under the act of Congress of July 27, 1866, c. 278, 14 Stat. 292, were valid maps of *definite location ;* the United States contending in those cases that they were, and the Southern Pacific Railroad Company contending that they were not, maps of that character; that that issue was determined in favor of the United States; and that as the lands now in dispute are within the limits of the line of road so designated, it is not open to the Southern Pacific Railroad Company, in this proceeding, to question the former determination that such maps sufficiently identified the lands granted to the Atlantic and Pacific Railroad Company by the act of 1866, and were therefore valid maps of definite location." p. 25.

And again, on page 29, after a quotation of the twenty-third section of the act of March 3, 1871, is this declaration :

" The Southern Pacific Railroad Company constructed the road thus contemplated, and claims that the lands here in dispute passed to it under the above act of 1871."

So also on page 46 :

" The lands now in controversy are situated opposite to and are coterminous with the first, second and fourth sections of the Southern Pacific Railroad as constructed between 1873 and 1877, inclusive, and within the primary and indemnity limits of the grant to the Southern Pacific Railroad Company made by the twenty-third section of the Texas and Pacific act of March 3, 1871."

And on page 61 the conclusion was summed up in these words :

" For the reasons stated, we are of opinion that it must be taken in this case to have been conclusively adjudicated in the former cases, as between the United States and the Southern Pacific Railroad Company—

" 1. That the maps filed by the Atlantic and Pacific Railroad Company in 1872 were sufficient, as maps of definite location, to identify the lands granted to that company by the act of 1866;

" 2. That upon the acceptance of those maps by the Land Department the rights of that company in the lands so granted, attached, by relation as of the date of the act of 1866; and

" 3. That in view of the conditions attached to the grant, and of the reservations of power in Congress contained in the act of 1866, such lands became, upon the passage of the forfeiture act of 1886, the property of the United States, and by force of that act were restored to the public domain without the Southern Pacific Railroad Company having acquired any interest therein that affected the power of the United States to forfeit and restore them to the public domain.

" These grounds being accepted as the basis of our decision, the law in the present case is clearly for the United States; for, as all the lands here in controversy are embraced by the maps of 1872, and therefore appertain to the line located by such maps, it must be, for the reasons stated in the former decision, that the United States is entitled, as between it and the Southern Pacific Railroad Company, to the relief given by the decree below."

Obviously the fact settled by the decisions in those cases was the filing by the Atlantic and Pacific of an approved map of definite location. Upon that the controversy hinged. Such a map having been filed the title of the Atlantic and Pacific vested as of the date of the act of July 27, 1866, and inasmuch as the Southern Pacific claimed only by a grant of date March 3, 1871, it took no title. This which is apparent from the foregoing quotations is emphasized by the full discussions in the opinions, as well as by the allegations in the pleadings upon which the cases were tried. That fact having been determined must be taken in the present suit as not open to dispute. The Atlantic and Pacific did file a sufficient map of definite location of its line from the Colorado River to the Pacific Ocean, and such map was approved by the Secretary of the Interior. Its title, therefore, to the land within the limits of the grant in California took effect as of date July 27, 1866. No claim of right

or title arising only in 1871 and created by an act of that date could affect its title.

But it was not adjudged in those cases either that the Southern Pacific had no title to any real estate by virtue of the act of 1866, or that if there was any real estate to which it had any claim or right by virtue of that act, such claim was not of equal force with that of the Atlantic and Pacific. The general statement at the close of the quotation from 146 U. S. 607, "that the latter company has no title of any kind to these lands," and the similar statement in paragraph 3 of the quotation from 168 U. S. 61, are to be taken as applicable only to the facts presented, and cannot be construed as announcing any determination as to matters and questions not appearing in the records. Of course, the decrees that were rendered in those cases are conclusive of the title to the property involved in them, no matter what claims or rights either party may have had and failed to produce, but as to property which was not involved in those suits they are conclusive only as to the matters which were actually litigated and determined. "On principle, a point not in litigation in one action cannot be received as conclusively settled in any subsequent action upon a different cause, because it might have been determined in the first action." *Cromwell* v. *County of Sac*, 94 U. S. 351, 356. "The particular matter in controversy in the adverse suit was the triangular piece of ground, which is not the matter of dispute in this action. The judgment in that case is therefore not conclusive in this as to matters which might have been decided, but only as to matters which were in fact decided." *Last Chance Mining Co.* v. *Tyler Mining Co.*, 157 U. S. 683, 687. The question here presented was not determined in the prior cases, and is whether the Southern Pacific acquired any title to lands other than those involved in those suits by virtue of the act of 1866, and that question, as we have seen, must be answered in the affirmative. Nor is this a mere technical difference between those cases and this. Counsel for the railroad company call the line from Mojave southward via Los Angeles to connect with the Texas and Pacific a "branch line," and that eastward from Mojave to Needles to connect with the Atlantic and Pacific a "main

line;" but by whatever names these two lines are called, they were built under the authority of two different statutes; the line from Mojave southward via Los Angeles under the authority of the act of Congress of March 3, 1871, an act which in terms authorized the building of a road from a point at or near Tehachapa Pass, which is in the vicinity of Mojave, southward by way of Los Angeles to connect with the Texas and Pacific, and gave no authority to build a line eastward from Mojave to connect with the Atlantic and Pacific; the line from Mojave eastward, under the act of 1866, which authorized the Southern Pacific to connect with the Atlantic and Pacific at or near the boundary of the State. The route which was selected by the company for this line was approved by Congress as authorized by the act of 1866. Hence the one line was built under the authority of the act of 1871, and the other under the authority of the act of 1866.

Our conclusions, therefore, are that the United States, having become by the forfeiture act of July 6, 1886, repossessed of all the rights and interests of the Atlantic and Pacific in this grant within the limits of California, hold an equal, undivided moiety in all the odd-numbered sections which lie within the conflicting place limits of the grant to the Atlantic and Pacific and of that made to the Southern Pacific by the act of July 27, 1866; and that the Southern Pacific holds the other equal, undivided moiety therein. The United States and the Southern Pacific being, therefore, tenants in common of a large body of lands, a partition is necessary. It was suggested by Secretary Lamar, in the letter heretofore referred to, that the Southern Pacific take only every other alternate odd-numbered section. We see no impropriety in such mode of partition, though, under the case as it stands, we can make no order to that effect. In whatever way partition may be made, equity requires that the lands which the Southern Pacific has assumed to sell and which were excepted by the Circuit Court from the decree in favor of the United States, and in respect to which they took their cross appeal, must be among those set off to the Southern Pacific, and thus the title of the purchasers be perfected. It is needless, therefore, to consider the merits of the cross appeal of the United States.

It is also unnecessary to determine the rights of the Southern Pacific to lands outside the limits of conflict. It having been adjudged that the Southern Pacific, by the construction of its road eastward from Mojave to Needles, became entitled to the benefit of the grant made by the eighteenth section of the act of 1866, the adjustment of the grant is properly to be had in the Land Department, subject, of course, if necessary, to further contests in the courts.

> *The decree of the Circuit Court of Appeals of the Ninth Circuit, affirming the decree of the Circuit Court for the Southern District of California will be reversed and the case remanded to the Circuit Court with instructions to enter a decree quieting the title of the United States to an equal, undivided moiety in all alternate sections within the place or granted limits of the Atlantic and Pacific in California, so far as those limits conflict with the like limits of the Southern Pacific, excepting therefrom those lands in respect to which there has been some prior adjudication, and to dismiss the bill as to all other lands without prejudice to any future suit or action.*