**NEW YORK CENTRAL SECURITIES COR-
PORATION v. UNITED STATES et al.**

District Court, S. D. New York.
May 20, 1931.

124

House, Grossman & Vorhaus, of New York City (Frederick A. Henry, of Cleveland, Ohio, and Joseph Fischer, of New York City, of counsel), for the petitioner.

Jacob Aronson, of New York City (Crosby J. Beakes, and James L. Homire, both of New York City, of counsel), for defendants New York Central, the Cleveland, C., C. & St. L. Ry. Co. and the Michigan Cent. R. R.

Daniel W. Knowlton, of Washington, D. C., for defendant Interstate Commerce Commission.

George Z. Medalie, U. S. Atty., of New York City (Elmer B. Collins, Sp. Asst. to the Atty. Gen., of counsel), for the United States.

Before MACK, Circuit Judge, and WOOLSEY and COXE, District Judges.

MACK, Circuit Judge.

This is a petition under the Urgent Deficiencies Act (38 Stat. 208, 219, 220), 28 U. S. C. §§ 46, 47 (28 USCA §§ 46, 47) to annul and set aside two orders of the Interstate Commerce Commission relating to railroad leases, brought by a minority stockholder of each of the lessor companies and of the lessee company. The order of July 2, 1929 (150 I. C. C. 278; 154 I. C. C. 489),[1] authorized acquisition of control, through leasing, by the Cleveland, Cincinnati, Chicago & St. Louis Railway Company (the "Big Four") of the properties of the Cincinnati Northern and of the Evansville, Indianapolis & Terre Haute lines and acquisition of control, through leasing, by the New York Central Railroad of the systems of the "Big Four," the Michigan Central, and of the Chicago, Kalamazoo & Saginaw Railway Company; the terms of the leases were approved by the Commission. The order of December 2, 1929 (158 I. C. C. 317),[2] authorized the "Big Four" to assume obligation and liability under the leases as to securities of its lessors, and the New York Central to assume like obligation and liability as to securities of its lessors, including the "Big Four."

[1] Finance Docket No. 5690, New York Central Unification.

[2] Finance Docket No. 7744, Assumption of Obligation & Liability by New York Central; F. D. No. 7745, Assumption of Obligation & Liability by Cleveland, Cincinnati, Chicago & St. Louis Ry. Co.

The first order was made pursuant to section 5 (2),[3] the second to section 20a [4] of the Transportation Act of 1920, 49 U. S. C. (49 USCA).

At the time of the first order, the New York Central owned, directly or through a subsidiary, 99.19 per cent. of the stock of the Michigan Central, 100 per cent. of the stock of the Kalamazoo and of the Terre Haute, and 97.72 per cent. of the stock of the Cincinnati Northern. It also held 91.31 per cent. of the common stock and 84.69 per cent. of the preferred stock of the "Big Four"; the increase of its holdings of the common stock from 64 per cent. in 1922 had been with the approval of the Commission. Control of Big Four by New York Central, 72 I. C. C. 96. The New York Central and its subsidiaries have common executives; thirteen of the fifteen directors of the "Big Four" and Michigan Central are also directors of the New York Central.

The proposed leases are for ninety-nine years, and include assignment by the lessors to the lessee of income from securities. The lessee agrees to maintain the lessors' corporate existence and to pay interest and other

[3] Section 5 (2). *Acquisition of Control of One Carrier by Another.* Whenever the commission is of opinion, after hearing, upon application of any carrier or carriers engaged in the transportation of passengers or property subject to this chapter, that the acquisition, to the extent indicated by the commission, by one of such carriers of the control of any other such carrier or carriers either under a lease or by the purchase of stock or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation, will be in the public interest, the commission shall have authority by order to approve and authorize such acquisition, under such rules and regulations and for such consideration and on such terms and conditions as shall be found by the commission to be just and reasonable in the premises.

[4] Section 20a (2). *Issuance of Securities; Assumption of Obligations; Authorization.* It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed "securities") or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose.

charges; further, to pay to the holder of each share of the capital stock of the lessors, not owned by the lessee, a specified amount as annual rental dividends. If unwilling to accept the rentals stipulated, the minority stockholders of the lessors have the alternative stipulated right to sell their stock to the lessee at values to be fixed by arbitrators; in the determination of the values, the effect of the leases is to be considered or disregarded at the option of the stockholder.

As a condition to the authorization of the leases, the Interstate Commerce Commission required the acquisition of certain intervening short lines by the New York Central, on the ground of public interest. These lines have been so acquired. 154 I. C. C. 489. Sixty-two other short lines, which connect with the unified, did not intervene; the Commission decided that for the present, at least, their acquisition was not a prerequisite to authorization of the leases.

Plaintiff corporation owns stock in the New York Central, the "Big Four," and the Michigan Central. It asserts its interest as a minority stockholder in each of them. Having intervened unsuccessfully in the application before the Commission, it filed its original petition, after entry of the order in Finance Docket No. 5690, and a supplemental petition, after entry of the order in Finance Docket No. 7744. The United States, the Commission, and the defendant railroads have moved to dismiss for lack of jurisdiction, and have also filed answers on the merits.

■■ 1. At the threshold, we are met with the defendant's contention that plaintiff has no standing to sue, because, as a minority stockholder in each corporation, its interest is not distinct from that of the respective defendant corporations, and its remedy, therefore, is by a stockholders' bill "in a suit involving the plenary equity jurisdiction of the District Court." See Pittsburgh & West Virginia Ry. v. United States, 281 U. S. 479, 486, 50 S. Ct. 378, 74 L. Ed. 980. And compare Sprunt & Son v. United States, 281 U. S. 249, 50 S. Ct. 315, 74 L. Ed. 832; Hines v. United States, 263 U. S. 143, 44 S. Ct. 72, 68 L. Ed. 216.

Plaintiff is a minority stockholder in two aspects: A. As a minority stockholder in the lessee corporation, its objection that the acquisition of the short lines adversely affected that corporation would not, standing alone, be heard in this suit, for clearly plaintiff cannot have sustained any injury in this respect other than indirectly through the lessee corporation. Pittsburgh & West Virginia Ry.

v. United States, supra, page 487 of 281 U. S., 50 S. Ct. 378. B. As a minority stockholder of lessor corporations, however, its alleged injury is not merely derivative through its ownership of stock, but is an independent injury to itself as a member of a class created by the leasing agreements between lessors and lessee. The payments of rental dividends are to be made directly to the minority stockholders of the lessors; no payment is made by the lessee to itself as stockholder of the lessors; nor is any rental payment in the form of guaranteed annual dividends paid to the lessor corporations for distribution to their minority stockholders. The minority stockholders are, in effect, third party beneficiaries of the authorized lease agreements, and, as such, have an independent interest, even though, because of dissatisfaction with the provisions, they may be unwilling to assert the rights accorded to them thereunder. The controversy, moreover, is not merely an ordinary internal fight between minority and majority, for the New York Central itself is the majority in the lessors, and, as such, has an interest adverse to the minority stockholders of the lessors. Our conclusion is supported by the express statement in Pittsburgh & West Virginia v. United States, supra, at 487 of 281 U. S:, 50 S. Ct. 378, that in some cases of acquisition and control the order does deal with "the interests of investors" as distinguished from their interests merely as minority stockholders in their corporation.[5] In the Pittsburgh Case, a petition was filed to annul an order of the Interstate Commerce Commission granting a certificate of public convenience under section 1 (18). The present suit challenges orders made under sections 5 (2) and 20a. In the former case, the minority stockholder had no standing except through its corporation; in the latter, as in reorganizations, the minority acquired by the leases a new interest of a substantially independent character pursuant to the authority granted by the Commission. The motion to dismiss for lack of jurisdiction must therefore be denied.

■ The plaintiff argues upon somewhat inconsistent grounds. On the one hand, it asserts that, since there is already control through stock ownership and interlocking directorates, the leases add nothing to the status quo ante the orders, and that the Commission is, therefore, without power to grant the authority on the basis of "public interest."

On the other hand, it urges that the leases, added to the existing stock control, effect a "consolidation" within the prohibition of section 5 (2).

First. Similar contentions have been overruled by the Interstate Commerce Commission in a series of decisions.[6] Continuous departmental practice under a statute is a weighty consideration in the determination by the courts of nice questions of construction. See Logan v. Davis, 233 U. S. 627, 34 S. Ct. 685, 58 L. Ed. 1121.

On the matter here presented, we are entirely in accord with the Commission. The statute permits acquisition (on a finding of public interest) by lease, by purchase of stock, "or in any other manner not involving the consolidation of such carriers into a single system for ownership and operation."

There is no express limitation on the authority to permit such acquisition by lease when stock ownership already gives control. Nor does the control by lease for ninety-nine years involve a "consolidation" within the intendment of the statute. Section 5 (6) makes it "lawful for two or more carriers by railroad, subject to this chapter, to consolidate their properties or any part thereof, into one corporation for the ownership, management, and operation" under certain conditions. Section 5 makes a clear distinction between "acquisition of control" and "consolidation." The latter is qualified in section 5 (2) by "a single system for ownership and operation," and in section 5 (6) by "into one corporation." Apparently the "consolidation" so qualified is the consolidation prohibited under section 5 (2). Construing the several subdivisions of section 5 together, it is clear that Congress laid down no test for consolidation other than ownership by one corporate entity; anything short of this cannot be deemed a consolidation within the qualification of subdivision 2.

■ The danger that the ultimate consolidation plan will subsequently require the unscrambling of properties so unified does not affect this construction. The same objection might have been urged against allowing acquisition of control by lease or by the pur-

---

[5] Mr. Justice Brandeis cited, as an example of such "acquisition of control," New York Central Unification, 150 I. C. C. 278, the very matter now before us. 281 U. S. at page 487, 50 S. Ct. 378, note 3.

[6] See control of El Paso & S. W. System, 90 I. C. C. 732; Control of Alabama & Vicksburg, etc., 111 I. C. C. 161, 169; Lease of Pan Handle, 72 I. C. C. 128, 133; New York Central Leases, 72 I. C. C. 243; Control of Central Pacific, 76 I. C. C. 508. And cf. Nickel Plate Unification, 105 I. C. C. 425, 430. See cases cited in Swaine, Reorganization of Corporations, 28 Columbia L. Rev. 29, 46, note 176; Simpson, Interstate Commerce Commission and Railroad Consolidation, 43 Harvard L. Rev. 192, 211, note 73.

chase of stock; yet, clearly, such modes of acquisition in the alternative are authorized in unequivocal terms by the Transportation Act. Nor can it be doubted that the consolidation plan will, in any event, compel important changes in the financial set-up of the carriers of the country; the Commission, charged with the preparation of the plan of consolidation, was intrusted with the task of considering applications for acquisition of control short of corporate consolidation. The criterion of "public interest" was evidently deemed an adequate limitation on approval of acquisitions inconsistent with the consolidation plan in the process of formulation. The approval here challenged was, therefore, within the jurisdiction of the Commission upon a justified finding that it was "in the public interest."

■■ Second. Plaintiff argues that the lessor and lessee properties are competing parallel lines, joint control of which is proscribed under the anti-trust laws, that the Commission is without power to exempt carriers from the operations of these laws, and that, if section 5 (8) of the statute be deemed to confer such power upon the Commission, it is unconstitutional as an attempted delegation of legislative power. We need not determine whether some of the lines here involved are "parallel and competing," for, assuming that they are, the power of the Commission is not thereby restricted. Section 5 (8) in express terms refers to carriers affected by any order under section 5, and provides that such carriers "are relieved" from the operation of the anti-trust laws. In other words, it is not the duty of the Commission to choose particular carriers as subjects for exemption; the Commission merely determines applications for acquisition and control under section 5 (2) in the light of the public interest, and Congress thereupon attaches the exemption of the statute expressed in section 5 (8). In this respect section 407 of the Transportation Act, 49 U. S. C. § 5 (8) (49 USCA § 5 (8), differs from section 12 of the Panama Canal Act (Act of Aug. 24, 1912, c. 390, 37 Stat. 566, 49 U. S. C. § 5 (12), 49 USCA § 5 (12). Under the Panama Canal Act, the Commission was authorized to select carriers for specific exemption from the prohibitions of the statute preserving competition; this was held valid. Lehigh Valley v. United States (D. C.) 234 F. 682, affirmed on another ground, 243 U. S. 412, 37 S. Ct. 397, 61 L. Ed. 819. Even if the Transportation Act, § 5 (8), were construed, therefore, to confer upon the Commission authority to grant ex-

emptions from the operation of the anti-trust laws, it would not, in the light of the whole section, be void as a delegation of legislative power. Since an executive officer may be empowered to make regulations to which criminal penalties attach (United States v. Grimaud, 220 U. S. 506, 31 S. Ct. 480, 55 L. Ed. 563), the Commission may be similarly empowered to make orders which prevent criminal penalties from attaching. Compare The Laura, 114 U. S. 411, 5 S. Ct. 881, 29 L. Ed. 147.

■ Nor is the standpoint of judgment, "in the public interest," provided for the Commission, too vague. The power of the Interstate Commerce Commission to regulate rates and to prevent unjust preferences and discriminations, to exempt carriers from "long and short haul provisions," and to control car service in the public interest, is no longer open to question.[7] Standards no more precise than that films be found "moral, educational, or amusing and harmless" (Mutual Film Corp. v. Ohio Industrial Comm., 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552, Ann. Cas. 1916C, 296); or that imported teas be pure (Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525); or requiring a finding of foreign discrimination (The Brig Aurora, 7 Cranch, 382, 3 L. Ed. 378; Field v. Clark, 143 U. S. 649, 12 S. Ct. 495, 36 L. Ed. 294, and cf. Hampton & Co. v. United States, 276 U. S. 394, 48 S. Ct. 348, 72 L. Ed. 624); or that an alien is an "undesirable resident" (Mahler v. Eby, 264 U. S. 32, 44 S. Ct. 283, 68 L. Ed. 549), have all been sustained as against a similar contention of invalidity. We find plaintiff's contention in this respect wholly without merit.

■ Third. Plaintiff urges that the dividend rentals are, as a matter of law, inadequate and unreasonable. · No direct claim of confiscation is alleged. In view of the fact that the lessee is the majority interest in the lessor corporations, the transaction compels careful scrutiny. 150 I. C. C. 314; 105 I. C. C. 425; cf. Farmers' L. & T. Co. v. N. Y. & N. R. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; Boyd v. N. Y. & H. R. Co. (D. C.) 220 F. 174, 181. The situation was adequately presented to the Commission by the intervention of the present plaintiffs.

[7] Interstate Commerce Comm. v. Chicago, Rock Island & Pac. Ry., 218 U. S. 88, 30 S. Ct. 651, 54 L. Ed. 946; Interstate Commerce Comm. v. Illinois Central Ry., 215 U. S. 453, 30 S. Ct. 155, 54 L. Ed. 280; The Intermountain Rate Cases, 234 U. S. 476, 34 S. Ct. 986, 58 L. Ed. 1408; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. 202.

■ Adequacy of rental dividends depends upon a valuation of stockholders' equities in the light of normal returns upon similar properties. This matter, like that of valuation for rate-making purposes, is peculiarly within the competence of an expert tribunal.

■ We do not substitute our own judgment for that of the Commission. The Transportation Act specifically empowers this body, to authorize acquisitions in the public interest "for such consideration and on such terms and conditions as shall be found by the commission to be just and reasonable in the premises." Section 5 (2). The scope of our review is limited to an inquiry as to whether the Commission acted arbitrarily. Upon the extensive record before the Commission, and in view of the difficulties inherent in railroad valuation, particularly as it affects a determination of guaranteed rentals over a long term of years, we hold that the Commission did not abuse its discretion in authorizing the leases on the terms therein specified. They provide for a guaranteed rental for ninety-nine years of $10 per share of the "Big Four" common and $50 per share of the Michigan Central, amounting to a return of 4.9 per cent. and 7.8 per cent. respectively on the stockholders' equity per share, as of November 1, 1927. This compares with the average dividend payment made for five and six years previously of $5.30 and $23.20, amounting to a return of approximately 2.9 per cent. and 2.8 per cent. on the estimated market price per share in the same period.[8] On the basis of the market value per share determined by the same method, the return of the guaranteed dividend rentals on such market value would be 5.6 per cent. and 6 per cent. Although the average net earnings [9] exceed the rentals guaranteed, the latter cannot be held inadequate, for accumulation of surplus is essential in railroad financing. Moreover, the leases provide for a sale of their stock to the lessee by the minority at a valuation determinable by arbitrators; in such valuation the effect of the leases is to be considered or disregarded at the option of the stockholder. The uncertain character of future net earnings for ninety-nine years, so strikingly illustrated by recent economic upheavals, and the contingent limitations upon return from railroad properties in view of section 15a of the Transportation Act, command caution in the guaranty of dividends in the form of rental. The public interest is the paramount consideration, and, although the interests of stockholders must not be ignored [see Cleveland, C., C. & St. Louis Ry. v. Jackson (C. C. A.) 22 F.(2d) 509; Nickel Plate Unification, 105 I. C. C. 425], the plaintiff has in our judgment failed to prove its claim of gross inadequacy.[10]

---

[8] The estimated market value per share was determined by using as a standard of comparison the ratio of net earnings to average market value of the stocks of certain major carriers of the country over a period of years. With this was also compared the ratio of guaranteed dividends to market value of railroad stocks, affording some indication that the guaranteed rental might result in an appreciation in market value of Big Four stock held by the minority.

[9] The significant figures on the adequacy of the rentals are set forth in the tabular form attached.

| | 1. Stockholders' Equity per Share, Nov. 1, 1927 | 2. Market Value by Method of Note 8 (1) | 3. Average Net Earnings per Share (3) | 4. Average Dividend Payments per share | 5. Rentals under the Leases |
|---|---|---|---|---|---|
| Big Four | $201.75 | $179.75 (2) | $19.86 | $5.30 (4) | $10.00 |
| Michigan Central | $639.78 | $827.25 (2) | 85.78 | *23.20 | 50.00 |

| | 6. Ratio of Dividend Payments to net income available (5) | 7. Ratio of Rentals to Average net earnings | 8. Ratio of Rentals to stockholders' equity per share | 9. Ratio of Average Dividend Payments to value under note 8 | 10. Ratio of Rentals to value under note 8. |
|---|---|---|---|---|---|
| Big Four | 25% | 50% | 4.9% | 2.9% | 5.6% |
| Michigan Central | *24% | 58% | 7.8% | *2.8% | 6% |

*Exclusive of extra dividend of 50% of accumulated surplus in 1927.
(1) Including New York Central Lines.
(2) Average for 1924–27, computed on basis of ratio of earnings to market value of major carriers, 1915–1925.
(3) Average for 1922–27.
(4) Average for 1922–26.
(5) Found by Commission for 1921–26.

[10] It should be noted that the only Commissioner who reached a contrary result on the question of guaranteed rentals considered them contrary to the public interest because excessive. 150 I. C. C. 324.

█ The finding of public interest is sufficiently supported by the evidence before the Commission. Although the fixed charges incident to long-term leasing generally make that method undesirable, the objection is minimized in the present case by the relatively small fixed charges contemplated in the payments to the minority [11] as against the economies sought to be effected by the unification. The changes contemplated under the unification affect (a) traffic; (b) transportation; (c) accounting; ₒ (d) repair of equipment. The suggested advantages include (a) revision of routes subject to the approval of the Commission, including short hauling by the lessor roads, and the use of shorter or alternate routes; ₐrates of the traffic units would be interchangeable; (b) possible new routes, through some physical improvements (a study indicated a potential aggregate saving of 11,796,789 car miles per year through direct routing, or, at present car mile costs, of about $1,000,000 per year); (c) adoption of a unified accounting system in place of the detailed accounting now required; (d) indefinitely deferring contemplated extensions of repair shops to cost $7,000,000 by the use of presently available "Big Four" facilities.

On these considerations, the Commission found public benefit. We cannot say that the tribunal which deals with the problems of carriers from day to day is too credulous in the face of these estimates of economies; its judgment thereon is informed by an experience which courts seldom have. In the light of the evidence, we cannot hold the finding of public interest to be arbitrary; with the weight of the evidence we are not concerned. Virginia Ry. v. United States, 272 U. S. 658, 47 S. Ct. 222, 71 L. Ed. 463; Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878.

█ Fourth. The authorization by the Commission of the leases upon the condition that intervening short lines be acquired is attacked on the ground that the attaching of the condition was beyond the power of the Commission. Plaintiff's contention is made by it as a stockholder of the New York Central. The argument is that the Commission, as a body of limited jurisdiction, must find statutory authority for its action. With this we agree, but we find that ample power has been conferred. Section 5 (2) authorizes approval of acquisition on such terms and conditions as the Commission finds just and reasonable. Section 20 (a) empowers the Commission, among other things, "to grant it [the application] with such modifications and upon such terms and conditions as the commission may deem necessary or appropriate in the premises." The order was permissive. The New York Central no longer objects to the condition (154 I. C. C. 489), and the plaintiff cannot challenge the judgment of its corporation in this proceeding. Pittsburgh & W. Va. Ry. v. U. S., supra. United States v. Chicago, etc., Ry., 282 U. S. 311, 51 S. Ct. 159, 75 L. Ed. 359, casts no doubt upon the power of the Commission to make its orders upon some conditions; in that case the court held that the condition imposed was unrelated to regulation of commerce. Here the condition directly affects commerce, for the short lines had a substantial interest in the plan of unification. Chicago Junction Case, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667.

█ Fifth. The orders of the Commission are further attacked on the ground that the leases as authorized are invalid under the law of Ohio. The original petition alleged the invalidity of the leases. The supplemental petition challenges the power of the Commission to authorize the assumption of security obligations on the ground that such assumption is not "for some lawful object within its corporate purposes" (section 20a), because in contravention of the statute of Ohio (set out in the margin) [12] the New York Central and the "Big Four" are incorporated in Ohio, as well as in other states; they own and operate railroad property in that state. The rentals are admittedly less than the net earnings for the preceding year. Plaintiff contends that the approval of the lease under section 5 (2) cannot supply the lack of pow-

---

[11] Maximum annual payments on present minority holdings would be as follows:

| Stock | No. of Shares involved | Div. rate or rental | Amt. Payable as rental |
|---|---|---|---|
| Big Four, preferred | 15,304 | 5 per cent | $ 76,520 |
| Big Four, common | 40,876 | 10 per cent | 408,760 |
| Michigan Central | 1,523 | 50 per cent | 76,150 |
| | | | *$561,430 |

*Not including amounts payable under collateral trust indenture to Guaranty Trust Co.

[12] General Code Ohio, § 8809, reads: "In case of the lease of a railroad situate in whole or part within this state, the rental reserved and secured for the leased road shall be equal, at least to its net earnings for the fiscal year next preceding the one in which the lease is made."

er in the corporation to make such a lease; and that the approval of the assumption of security obligations under section 20a is beyond the power of the Commission because of the express statutory limitation that the assumption be "within its corporate purposes." The first objection is, in substance, that it was ultra vires the corporation to execute these leases. While the fact that the order was permissive rather than mandatory does not deprive the court of jurisdiction in this' proceeding (Chicago Junction Case, 264 U. S. 258, 44 S. Ct. 317, 68 L. Ed. 667), the attack based upon the state law limitation of the corporate power has no proper place in a suit to annul the order. Pittsburgh & W. Va. Ry. v. United States, 281 U. S. 479, 488, 50 S. Ct. 378, 74 L. Ed. 980, and cf. Cleveland, etc., Ry. v. United States, 275 U. S. 404, 48 S. Ct. 189, 72 L. Ed. 338. The controversy as such is between the corporation and the minority stockholders.

The second objection, however, is based on the statutory power of the Commission. It can no longer be doubted that, under its constitutional power to regulate interstate commerce, Congress may disregard prohibitions affecting such commerce, imposed by the states. New York v. United States, 257 U. S. 591, 42 S. Ct. 239, 66 L. Ed. 385; Colorado v. United States, 271 U. S. 153, 46 S. Ct. 452, 70 L. Ed. 878. It may also, under the same constitutional grant of power, confer upon corporations created under state statutes powers not conferred by state charter. New York v. United States, supra; R. R. Comm. v. C. B. & Q. R. Co., 257 U. S. 563, 42 S. Ct. 232, 66 L. Ed. 371. See California v. Central Pacific Ry., 127 U. S. 1, 8 S. Ct. 1073, 32 L. Ed. 150; Southern Pacific Ry. v. United States, 183 U. S. 519, 22 S. Ct. 154, 46 L. Ed. 307. In the instant case, moreover, the power to lease is granted by the Ohio statute; the statute merely places a restraint upon the exercise of the power. Though in the original statute (70 Ohio Laws, 129, § 24) the restraint was in the form of a proviso on the power to lease, the Code now in force deals with the minimum rental in a separate section. In our judgment, the power to lease is separable from the rental to be paid. Nor has the state of Ohio asserted any claim of ultra vires on its own behalf (see Cleveland, etc., Ry. v. United States, 275 U. S. 405, 414, 48 S. Ct. 189, 72 L. Ed. 338), although it was apparently notified of the pendency of the order as provided in section 20a. We consider the corporate power unaffected by the limitation thereon.

Regardless, however, of whether or not the statutory provision as to the rentals in a lease is in effect as well as in form merely a limitation on the granted power to lease, Congress has exercised its control in the field of railroad securities. See Colorado v. United States, 271 U. S. 153, 165, 46 S. Ct. 452, 70 L. Ed. 878; R. R. Comm. v. So. Pac. Ry., 264 U. S. 331, 44 S. Ct. 376, 68 L. Ed. 713. The authority to approve acquisition of control by lease is conferred upon the Commission by section 5 (2); the "exclusive jurisdiction" to authorize issuance of securities and the assumption of security obligations is conferred by section 20a.[13] The limitation as to "corporate purposes," as evidenced by the legislative history of the section, is not a limitation based upon the charter powers of the corporation.[14] The statute manifestly was

[13] Section 20a (7) provides: "The jurisdiction conferred upon the commission by this section shall be exclusive and plenary, and a carrier may issue securities and assume obligations or liabilities in accordance with the provisions of this section without securing approval other than as specified herein."

[14] Section 20a (7) of the Esch-Pomerene Bill of June 2, 1919 (66th Cong. 1st Sess. H. R. 4378, S. No. 1256), and substantially in section 24 of the Cummins Bill of Aug. 23, 1919 (66th Cong. 1st Sess. S. No. 2906); it was not contained in earlier bills. Later it became section 437 of the next Esch Bill (66th Cong. 1st Sess. H. R. No. 10453), which was section 439 of the Conference Bill. On November 17, 1919, an amendment was offered in the House to strike out this paragraph and to provide that no securities should be issued under the act, "except in the manner and form prescribed by the Laws of the state which created such common carrier, and that the section of the Act shall not be construed as a limitation of state authority, but only as cumulative thereof." This amendment was defeated after debate. Cong. Rec., 66th Cong. 1st Sess., vol. 58, pt. 9, pp. 8673-8676.
The theory of the legislation was explained by both Senator Cummins and Representative Esch. Senator Cummins reported regarding section 24 of his bill: "But I think there is no real opposition to a provision which confers upon the Interstate Commerce Commission or some other Federal agency the supervision of the issuance of railway securities, in that way relieving railway companies of the regulation of forty of the forty-eight states of the Union. * * * This is intended to concentrate that power in the hands of a Federal tribunal." Cong. Rec. 66th Cong. 2d Sess., vol. 59, pt. 1, pp. 137, 138.
Mr. Esch reported to the House: "Without Federal control, the carriers would have to be subjected to the diversified requirements of the several states. * * * The enactment of the pending bill will put the control over stock and bond issues exclusively in the hands of the Federal Government and will result in uniformity and greater promptness of action." 66th Cong., 1st Sess. House Report, No. 457, Nov. 10, 1919.
It is significant, moreover, that the phrase "corporate purposes" originally read "corporate powers" in the Esch-Pomerene Bill. The change was apparently made at the suggestion of counsel for the Association of Railway Executives, who pointed out that "powers might be construed to mean state powers;" to avoid the misconstruction, "purposes" was substituted. Hearings before House Committee on Interstate and Foreign Commerce, 66th Cong.; 1st Sess., H. R. 4378, pt. 8, p. 1267.

meant to draw within the federal control the complete regulation of the railroad securities, unhampered by state action or restriction.

When Congress has entered upon a field directly related to interstate commerce, restrictions imposed by the states that directly affect the federal regulation are of no further validity. That the proposal emanates from the carriers rather than from the Commission is, of course, not material; even in the ultimate consolidation contemplated under section 5, proposals under the act are generally initiated by the carriers themselves.

Sixth. Plaintiff contends that the lease of the Michigan Central was not duly authorized, because the stock thereof owned by the New York Central is pledged under a trust agreement which requires the consent of 75 per cent. of the bondholders, and this was not obtained. Suffice it to say that plaintiff is not a party in interest under the agreement. The danger of subsequent action by the bondholders is too remote.

The temporary injunction must be denied, and the petition to set aside and annul the orders of the Interstate Commerce Commission must be dismissed, at petitioner's cost.